[This decision has been published in *Ohio Official Reports* at 93 Ohio St. 3d 49.]

THE STATE OF OHIO, APPELLEE, *v*. ISSA, APPELLANT.

[Cite as *State v. Issa*, 2001-Ohio-1290.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-2449—Submitted March 27, 2001—Decided August 29, 2001.)

APPEAL from the Hamilton County Court of Common Pleas, No. B-9709438.

———————————

DOUGLAS, J.

{¶ 1} At approximately 1:30 a.m. on November 22, 1997, Andre Miles, armed with a high-powered assault rifle, confronted brothers Maher and Ziad Khriss in a parking lot in front of Save-Way II Supermarket in Cincinnati, Ohio ("Save-Way") and demanded money. As Maher and Ziad put money on the ground and pleaded for their lives, Miles shot and killed them.

{¶ 2} After investigating the shootings, Cincinnati police concluded that Miles had been hired to kill Maher. The police theorized that Maher's wife, Linda Khriss, had offered to pay defendant-appellant, Ahmad Fawzi Issa, to kill Maher. The police believed that appellant then enlisted Miles to do the killing, supplied him with the weapon, and arranged the opportunity. Appellant, Miles, and Linda were each charged with aggravated murder.

{¶ 3} Prior to the murders, Maher and Linda Khriss owned and operated Save-Way. In addition to Maher and Linda, Renee Hayes, Souhail Gammoh, and appellant worked at the store. Bonnie Willis and her brother Joshua Willis, who were both teenagers at the time of the murders, lived with their mother approximately one block from Save-Way. Because they often shopped at Save-Way, they were familiar with the store employees. Miles had previously lived with the Willis family and was a close friend of Bonnie and Joshua.

**{¶ 4}** In the two weeks preceding the murders, two witnesses saw appellant with a rifle in his apartment. On November 14, Dwyane Howard, Hayes's husband, went to appellant's apartment to wake him for work. Appellant invited Howard in and showed him a military-style rifle. When Howard asked appellant what he was going to do with the rifle, appellant's only response was "a little sneer." After the murders, appellant called Howard and told him not to tell anyone that he had seen appellant with a gun. At appellant's trial, Howard identified the murder weapon as being identical to the rifle appellant had shown him. No more than two weeks before the murders, appellant's coworker and friend, Gammoh, while visiting at appellant's apartment, also saw appellant with a rifle.

**{¶ 5}** A few days before the murders, Joshua went to Save-Way and saw Miles standing out in front of the store. Joshua and Miles started talking, and Miles told Joshua that appellant was going to pay him to kill somebody. Miles asked Joshua if he wanted to take part in the crime for half of the money. Joshua did not take Miles seriously and told him he was crazy. On November 20, the Thursday evening before the Saturday morning murders, Joshua told Bonnie about his conversation with Miles. Bonnie also did not believe that Miles would actually kill someone, because Miles "had a tendency to * * * talk big." That is, he talked "about doing a lot of things and never did it."

**{¶ 6}** Linda, Maher, Gammoh, and Hayes worked late at Save-Way on the evening of November 21. At approximately 10:00 p.m., Miles arrived at the store and asked for appellant. Although appellant was scheduled to work at 10:00 p.m., he was not yet there. Linda drove to appellant's apartment to wake him, and then she returned to the store. Appellant arrived around 11:15 p.m. Miles was waiting at the store for appellant, and when he arrived, appellant and Miles went outside together to talk.

**{¶ 7}** Around midnight, Maher left Save-Way with a friend to check on another store that Maher owned. Maher left his truck in the Save-Way parking lot

and instructed Linda and appellant to put the keys to the truck near the right front tire and that Maher would come back later to get the truck.

{¶ 8} At approximately 1:09 a.m. the Save-Way employees closed the store for the night. Appellant put the keys near Maher's truck as he had been instructed. Appellant's mother was visiting from Jordan and was with appellant at the store when it closed. Appellant, his mother, and Gammoh left the store in appellant's car. Appellant drove his mother to his apartment, and then he drove Gammoh home. When appellant dropped Gammoh off at approximately 1:20 a.m., he told Gammoh that he was going back home to check on his mother but that he might come back later and take Gammoh to a bar. Approximately twenty-five to thirty-five minutes later, appellant returned to Gammoh's apartment, and they went to a bar together. After Gammoh heard about the murders, he asked appellant where he went before he returned to Gammoh's apartment. Appellant told Gammoh, "Don't tell the police. Tell them that we were together all the time."

{¶ 9} At approximately 1:26 a.m. on November 22, Sherese Washington was driving near Save-Way when she heard gunshots. Frightened, she stopped her car and turned off the headlights. She then saw a man run from the Save-Way parking lot and down Iroll Street (the street on which Bonnie and Joshua lived). Sherese went home and called 911. Within four minutes of the shooting, Cincinnati police officers arrived at Save-Way and discovered Maher's and Ziad's bodies in the parking lot. Medical personnel arrived shortly thereafter but were unable to revive the Khriss brothers.

{¶ 10} Near the bodies, crime-scene investigators for the Cincinnati Police found six 7.62 caliber rifle casings, a broken beverage bottle, and several $1 bills. A small crater in the blacktop near Ziad's body and a fresh gouge in the dirt near Maher's body were noted by officers as possibly having been made by gunfire. Officers also documented that three milk crates had been arranged like steps behind a dumpster in the parking lot. The police found this noteworthy because all the

other items behind the dumpster were in disarray, and the police speculated that the perpetrator may have arranged these milk crates.

{¶ 11} Dr. Lawrence Schulz, a deputy coroner for Hamilton County, performed autopsies on Maher and Ziad and testified as to his findings. Schulz found that a single bullet had struck the palm of Maher's left hand and traveled through the back of his hand and then entered his chest. The bullet then perforated Maher's lungs and his aorta, causing his death within a few minutes. Ziad had been shot in the palm of his right hand and twice in his left arm. Each bullet that struck his arm traveled through to his chest.

{¶ 12} Joshua testified that around 5:00 p.m. on November 22, Miles called him and told him that he had killed Maher and Ziad and that he had put the gun in Bonnie and Joshua's back yard in a white plastic bag. He told Joshua not to touch the gun.

{¶ 13} The following day, November 23, Miles came to the Willises' home. Bonnie and Joshua both testified regarding the conversation they had with Miles. Miles told them that appellant was going to pay him $2,000 for killing Maher but "[s]ince [Maher's] brother also got killed that night he had to throw in an extra $1,500." According to Miles, appellant had not paid him yet. Miles told the Willises that, on the night of the shooting, appellant gave Miles the rifle, which Miles described as an M-90. Miles then sat on milk crates behind a dumpster outside the store and waited for Maher to come back for his truck. When Maher returned with Ziad, Miles confronted them and demanded money. Maher and Ziad pulled money from their pockets, dropped it on the ground and pleaded with Miles not to shoot.

{¶ 14} Miles said that when he reached down for the money, the gun went off and the beverage bottle that Maher was holding shattered. Then Miles said he "got trigger happy. He freaked. He shot them once. He might as well kill them." While Maher was "still squirming," Miles said, he shot him in the head, and then

shot Ziad in the head. After that, Miles picked up the money they had thrown down, but said he left two $100 bills on the ground. Miles said that after the shooting he ran down Iroll Street, put the rifle in the Willises' back yard, and then met appellant in a nearby parking lot and appellant drove him home.

{¶ 15} Bonnie and Joshua noticed that Miles was wearing new clothes "from head to toe." Miles said that he "had bought the new clothes with the money that he got from the two victims." While describing the killings, Miles showed "no remorse at all. He was actually bragging." Miles also told Bonnie and Joshua, "If anybody knows about this or tells, I'll kill them." Miles reiterated that the rifle was in a white plastic bag in their back yard and that neither Bonnie nor Joshua should touch it. Miles promised to come back and remove the gun. Both Bonnie and Joshua saw an object wrapped in a white bag in their back yard and Joshua described it as "shaped like a gun."

{¶ 16} A few days later, Joshua went to Save-Way, and as soon as appellant saw him appellant asked, "Does anybody know?" Joshua said, "No, not that I know of." Joshua then told appellant, "You're going to have to come and get this gun. I don't want to put my family in this type situation." Although Joshua did not mention Miles, appellant replied, "Okay. I'll talk to Andre [Miles] and if Andre don't come and get it, I will." After a few days, Joshua noticed the white bag was still in his yard. Joshua again went to the store and confronted appellant about it. Appellant again promised Joshua that either he or Miles would remove the gun. Bonnie also went to the store and told appellant that the gun needed to be removed from their yard. Appellant told her the same thing he had told Joshua. Appellant also told Bonnie to "[t]ell [Miles] not to come around the store because the police were investigating, that he would get in touch with him." A few days later, Miles removed the gun.

{¶ 17} On November 25, while working at Save-Way, Hayes saw Linda hand appellant two $1,000 packets in cash and "some other money." The state

theorized that this represented at least a partial payoff for the killing. The defense, on the other hand, attempted to show that this money was deposited in a Save-Way bank account later that same day. The bank deposit ticket entered into evidence, however, indicated that the money deposited in the Save-Way account on that day did not include $2,000 in cash. The defense suggested that Hayes had been mistaken regarding the amount she saw Linda give appellant.

{¶ 18} On December 4, police learned that Miles had admitted to Bonnie and Joshua that he had committed the murders. Police arrested Miles that evening, and he confessed to the crime and sketched a map depicting where he had disposed of the murder weapon. Following the map, police recovered a MAK-90, 7.62 caliber, semiautomatic rifle. Expert testimony established that the rifle had fired the fatal bullet extracted from Maher's body, thus confirming it was the murder weapon. An attempt to determine who had purchased the weapon was unsuccessful.

{¶ 19} In the same vicinity as the rifle, police found a banana-style magazine clip that fit the murder weapon. The clip contained twelve 7.62 caliber hollow-point rifle bullets. The same foreign manufacturer made all of the shells found at the crime scene and the bullets in the clip. There were no fingerprints on the rifle, the clip, or the ammunition.

{¶ 20} On December 5, officers executed a search warrant on appellant's apartment and found a single live 7.62 caliber bullet in a nightstand drawer in appellant's bedroom. The manufacturer of this bullet was different from the manufacturer of the bullets found in the murder weapon's clip and from the casings found at the crime scene.

{¶ 21} A jury convicted appellant of the aggravated murder of Maher with a death penalty specification charging that the offense was committed for hire. R.C. 2903.01(A) and 2929.04(A)(2). After a penalty hearing, the jury recommended the death penalty. The trial court sentenced appellant to death and an additional one-

year term for a gun specification. This matter is now before this court upon an appeal as of right.

{¶ 22} Appellant has raised fifteen propositions of law. See Appendix. We have reviewed each and have determined that none of those propositions justifies reversal of appellant's conviction for aggravated murder. Pursuant to R.C. 2929.05(A), we have also independently weighed the specified aggravating circumstance against the mitigating evidence and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's conviction and death sentence.

Vienna Convention on Consular Relations

{¶ 23} Appellant, a Jordanian national, asserts in his first proposition of law that his rights guaranteed by the Vienna Convention on Consular Relations ("VCCR") were violated when arresting officers failed to inform him that as a foreign national he had a right to meet with consular officials from Jordan.[1] Appellant did not raise this issue at trial but now contends that this alleged violation of his rights rendered his postarrest statement inadmissible. Because testimony was admitted regarding his postarrest statement, appellant urges this court to reverse his conviction and remand this cause for a new trial.

{¶ 24} The VCCR is a seventy-nine-article treaty to which both the United States and Jordan are signatories. The Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77, 596 U.N.T.S. 261. It was negotiated in 1963 and ratified by the United States in 1969. Article 36 of the VCCR provides:

"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

"* * *

---

1. The record does not reflect whether the police advised appellant of his right to consular access. For the purposes of this appeal, we assume that he was not advised of that right.

"(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.*

"* * *

"2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." (Emphasis added.)

{¶ 25} Although the issue appellant raises regarding VCCR rights is an issue of first impression in this court, it has been raised and addressed in various other courts. At least one court has rejected the claim by holding that Article 36 does not create individually enforceable rights. *United States v. Li* (C.A.1, 2000), 206 F.3d 56, 62-66. But, see, *Breard v. Greene* (1998), 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529, 538 (the VCCR "arguably confers on an individual the right to consular assistance following arrest"). Many other courts have held that even if individuals can enforce the treaty provisions, application of the exclusionary rule is not an appropriate remedy for a violation. See, *e.g.*, *United States v. Alvarado-Torres* (S.D.Cal.1999), 45 F.Supp.2d 986, 993-994; *United States v. Page* (C.A.6, 2000), 232 F.3d 536, 540; *United States v. Chaparro-Alcantara* (C.A.7, 2000), 226 F.3d 616; *United States v. Jimenez-Nava* (C.A.5, 2001), 243 F.3d 192, 198-200; *United States v. Lombera-Camorlinga* (C.A.9, 2000), 206 F.3d 882 (en banc).

**{¶ 26}** For the purposes of this case, we assume, without deciding, that upon his arrest appellant had an individually enforceable right under Article 36 to be informed of his right to consular notification and that the appropriate remedy for the violation of that right is the suppression of appellant's postarrest statement.[2] Even applying the foregoing assumptions, we nevertheless reach the conclusion that appellant is not entitled to the relief he seeks.

**{¶ 27}** As stated previously, Article 36(2) of the VCCR provides, "The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State * * *." Thus, claims of error based on violations of the VCCR for failure to notify a defendant of his right to consular access can be procedurally defaulted if not properly raised. *Breard v. Greene*, 523 U.S. at 375-376, 118 S.Ct. at 1354-1355, 140 L.Ed.2d at 537. This court has long held that failure to raise an issue in the trial court or the court of appeals waives all but plain error in our review. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, vacated on other grounds (1978),

---

2. We doubt whether suppression of evidence is the appropriate remedy for a violation of the VCCR. Rights of persons arising under a treaty are regarded as if they arose under a statute of this state. *State v. Vanderpool* (1883), 39 Ohio St. 273, 276-277. Thus, as in the case of a statutory violation, the exclusionary rule is not an appropriate sanction, absent an underlying constitutional violation, unless the treaty expressly provides for that remedy. *Kettering v. Hollen* (1980), 64 Ohio St.2d 232, 234, 18 O.O.3d 435, 437, 416 N.E.2d 598, 600. Nothing in the text of the VCCR requires suppression of evidence, and "there is no indication that the drafters of the Vienna Convention had these 'uniquely American rights in mind, especially given the fact that even the United States Supreme Court did not require Fifth and Sixth Amendment post-arrest warnings until it decided *Miranda* in 1966, three years after the treaty was drafted.' " *United States v. Page* (C.A.6, 2000), 232 F.3d 536, 541, quoting *United States v. Lombera-Camorlinga* (C.A.9, 2000), 206 F.3d 882, 886 (en banc). Furthermore, "no other signatories to the Vienna Convention have permitted suppression under similar circumstances, and * * * two (Italy and Australia) have specifically rejected it." *Id.* at 888.

Regardless of the appropriate remedy for violations of its provisions, the VCCR is the law of the land and police officers are required to comply with its terms. Section 2, Article VI, United States Constitution.

438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. Thus, because appellant failed to raise this issue in the trial court, he has waived all but plain error.

{¶ 28} Plain error exists when it can be said that but for the error, the outcome of the trial would clearly have been otherwise. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899. We find that even if the trial court erred in admitting testimony regarding appellant's postarrest statement, that testimony did not affect the outcome of the trial.

{¶ 29} At trial, Officer David Feldhaus testified regarding appellant's statement to police officers after his arrest. Feldhaus testified that after waiving his *Miranda* rights, appellant denied any involvement in the murders. When police questioned appellant regarding his actions around the time of the murders, appellant said that after closing the store, he placed the keys to Maher's truck near the vehicle as instructed, drove his mother to his apartment, and then went with Gammoh to a bar, where he and Gammoh remained until closing.

{¶ 30} If the jury believed Gammoh's testimony that appellant had left Gammoh's company for twenty-five to thirty-five minutes before they went to the bar, then appellant's omission of this fact could have been perceived by the jury as an intent to deceive police regarding his whereabouts at the time of the murders. However, the jury heard evidence far more damaging in this regard through Gammoh's testimony. Gammoh testified that appellant told him not to tell the police about the time they were apart and instructed Gammoh to say that he and appellant were together all night. Whereas the jury could have concluded that appellant's failure to inform police of the time he was not with Gammoh was simply the result of a lapse of memory or the omission of a seemingly unimportant detail, Gammoh's testimony clearly indicates appellant's intent to deceive the police regarding his actions. Hence, this portion of appellant's postarrest statement was not damaging.

**{¶ 31}** Appellant's postarrest admission that he knew that Maher would be coming back to the store later to get his truck may have led jurors to the conclusion that appellant conveyed this information to Miles. However, Officer Feldhaus's testimony also made it clear that Linda knew that her husband would be returning to Save-Way to get his truck. Because the jurors were aware of the state's theory that Linda was behind the murder-for-hire scheme, Feldhaus's testimony could have put doubt in their minds regarding whether it was Linda or appellant who had arranged for Miles to wait for Maher. Regardless, the other evidence against appellant is so strong that we cannot say that without this testimony the outcome of the trial would clearly have been otherwise. For the foregoing reasons, appellant's first proposition of law is overruled.

**{¶ 32}** *Amicus curiae*, the National Association of Criminal Defense Lawyers, argues that if the Jordanian Consulate had been advised of appellant's arrest, it would have provided assistance with certain aspects of the mitigation portion of appellant's trial. Specifically, *amicus* suggests that Jordanian officials could have provided complete transcripts of appellant's educational record rather than just the certificates of completion and good behavior that were presented in mitigation. In addition, one of appellant's brothers was unable to obtain a visa and was therefore unavailable to provide mitigation testimony during the penalty phase of appellant's trial. *Amicus* alleges that Jordanian Consul could have assisted in obtaining a visa. For these reasons, *amicus* urges us to order a new "mitigation trial."

**{¶ 33}** Even assuming that Jordanian consul would have provided assistance to appellant's defense in the manner suggested by *amicus*, that assistance would not have affected the jury's penalty recommendation. Appellant provided proof that he had completed the schooling and that he was well behaved in school. The transcripts would not have added any additional weight to the mitigating evidence.

**{¶ 34}** With regard to a visa for appellant's brother, appellant's attorney advised the trial court that had appellant's brother been available, his testimony would have been similar to the testimony of Jamal Issa, also appellant's brother, who did provide mitigation testimony. Therefore, his testimony would have provided no additional weight to the mitigating factors. For the above reasons, we reject the *amicus*'s argument.

Admission of Accomplice's Pretrial Statements

**{¶ 35}** In his second proposition of law, appellant asserts that the trial court erred in allowing Bonnie and Joshua to testify regarding Miles's confession. Appellant contends that the admission of this evidence violated his right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. In addition, although not explicitly stated in his second proposition of law, appellant argues that the out-of-court statements should have been excluded as inadmissible hearsay.

**{¶ 36}** We first discuss appellant's hearsay argument. The trial court admitted Bonnie's and Joshua's testimony regarding Miles's statements under the exception to the hearsay rule for statements against interest pursuant to Evid.R. 804(B)(3).[3] In order for a declarant's statement to qualify as an Evid.R. 804 exception to hearsay, it must first be shown that the declarant is unavailable as a witness. Evid.R. 804(B). Appellant argues that Evid.R. 804 was not applicable in this case because the declarant, Miles, was not unavailable as a witness.

---

3. Evid.R. 804(B)(3) provides:
   "Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
   "* * *
   "(3) *Statement against interest*. A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

**{¶ 37}** "Unavailability" is defined in Evid.R. 804(A)(2):

" 'Unavailability as a witness' includes situations in which the declarant:

"* * *

"(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an *order* of the court to do so." (Emphasis added.)

**{¶ 38}** Appellant argues that Miles did not satisfy the definition of unavailable because "the Court did not *order* Miles to testify." (Emphasis added.) Contrary to appellant's assertion, we find that the record clearly establishes that Miles was unavailable as a witness before the trial court. Our finding is based on the following discussion between the court and Miles after Miles was sworn in and refused to testify:

"THE COURT: All right.

"Mr. Miles, let me make this statement to you. You're here under subpoena to testify as a witness in this case. You do have an obligation to testify if subpoenaed and you have been subpoenaed.

"I want to advise you, though, that you do not have to testify as to anything that my [*sic*] tend to incriminate yourself if called to the witness stand to testify. Okay?

"Now, with that caution in mind, I want to ask you again are you going to testify in this case?

"MR. MILES: I'm not going to testify.

"THE COURT: Why not?

"MR. MILES: Because I'm not going to testify.

"THE COURT: All right. You just simply are refusing to testify, even though I'm informing you you do have an obligation to testify, except to those things that might incriminate yourself?

"MR. MILES: Yes."

**{¶ 39}** The subpoena issued to Miles, to which the court referred, stated: "You are required * * * to testify * * * in the case of State of Ohio versus **Ahmed Fawzi Issa** * * *. **Fail not under penalty of the law.**" (Emphasis *sic*.) We find that the court's repeated statements to Miles that he had an obligation to testify, combined with the court's reference to the subpoena (which clearly subjected Miles to criminal penalty for failure to testify), satisfied the requirements of Evid.R. 804(A)(2).

**{¶ 40}** We further note that the 1980 Staff Note to Evid.R. 804(A)(2) provides that to be unavailable, a witness must refuse to testify "despite all efforts by the court to compel him to do so." Although the judge did not explicitly order Miles to testify, he did attempt to compel him. Furthermore, even if the court had expressly threatened contempt proceedings for refusal to obey a court order, the threat would undoubtedly have been unavailing, as Miles was soon to be tried for murder and the state had strong evidence against him. For the foregoing reasons, we find that appellant's assertion with regard to Evid.R. 804(A) is without merit.

**{¶ 41}** We now turn to appellant's contention that the admission of Bonnie and Joshua's testimony regarding Miles's confession violated his right to confront the witnesses against him as guaranteed by the United States and Ohio Constitutions.[4] " 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *State v. Madrigal* (2000), 87 Ohio St.3d 378, 384, 721 N.E.2d 52, 61, quoting *Maryland v. Craig* (1990), 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666, 678.

---

4. The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."

Section 10, Article I of the Ohio Constitution provides:

"In any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *."

Although the hearsay rules and the Confrontation Clause are generally designed to protect similar ideals, the two are not equivalent. *Idaho v. Wright* (1990), 497 U.S. 805, 814, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638, 651. In other words, the Confrontation Clause may bar the admission of evidence that would otherwise be admissible under an exception to the hearsay rule. *Id.* Consequently, although testimony concerning Miles's confession qualified as an exception to the hearsay rule, the admission of the testimony could nevertheless have violated appellant's right to confront witnesses against him.

**{¶ 42}** In *Lilly v. Virginia* (1999), 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (plurality opinion), the lead opinion recognized that the type of hearsay statement challenged herein, *i.e.*, an out-of-court statement made by an accomplice that incriminates the defendant, is often made under circumstances that render the statement inherently unreliable. For example, when a declarant makes such a statement to officers while he is in police custody, the declarant has an interest in inculpating another so as to shift the blame away from himself. In that situation, a declarant will often admit to committing a lesser crime and point to an accomplice (the defendant) as the culprit in a more serious crime. While the statement is technically against the declarant's penal interest, it is also self-serving and, for that reason, particularly deserving of cross-examination when used as evidence against the defendant. *Id.* at 131-132 and 138, 119 S.Ct. at 1897-1898 and 1901, 144 L.Ed.2d at 131 and 135. Because this type of statement is inherently unreliable, the lead opinion stated that, in order to satisfy the Sixth Amendment, the circumstances surrounding the making of the statement must make the declarant's truthfulness so clear that " 'the test of cross-examination would be of marginal utility.' " *Id.* at 136, 119 S.Ct. at 1900, 144 L.Ed.2d at 134, quoting *Idaho v. Wright*, 497 U.S. at 820, 110 S.Ct. at 3149, 111 L.Ed.2d at 655.

**{¶ 43}** This court followed *Lilly* in *State v. Madrigal*, 87 Ohio St.3d 378, 721 N.E.2d 52. In *Madrigal*, we held that "[o]ut-of-court statements made by an

accomplice that incriminate the defendant may be admitted as evidence if the statement" contains "adequate indicia of reliability." *Id*. at paragraphs one and three of the syllabus. The relevant circumstances in measuring the degree of reliability include " '*only those that surround* the making of the statement' " and "do not include those that may be added using hindsight." (Emphasis *sic*.) *Id*. at 387, 721 N.E.2d at 63, quoting *Wright*, 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 655. Thus, the fact that other evidence corroborates the statement is irrelevant in a Confrontation Clause analysis. *Madrigal*, 87 Ohio St.3d at 387, 721 N.E.2d at 63, citing *Lilly*, 527 U.S. at 138, 119 S.Ct. at 1900-1901, 144 L.Ed.2d at 135.

{¶ 44} Applying *Lilly* and *Madrigal* to this case, it is clear that in order to determine whether the admission of evidence concerning Miles's confession violated appellant's confrontation rights, we must examine the circumstances under which the confession was made. Unlike the declarants in *Lilly* and *Madrigal*, Miles was not talking to police as a suspect when he made the out-of-court statement. Miles's confession was made spontaneously and voluntarily to his friends in their home. Moreover, Miles had nothing to gain from inculpating appellant in the crime. In fact, by stating that appellant had hired him to kill Maher, Miles was admitting a capital crime, *i.e.*, murder for hire. Furthermore, Miles's statement was clearly not an attempt to shift blame from himself because he was bragging about his role as the shooter in the double homicide.

{¶ 45} We therefore find that the circumstances surrounding the confession did " 'render the declarant [Miles] particularly worthy of belief.' " *Madrigal*, 87 Ohio St.3d at 387, 721 N.E.2d at 63, quoting *Wright*, 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 655. Our decision herein is buttressed by Chief Justice Rehnquist's separate opinion in *Lilly*, in which he noted that in a prior case, the court "recognized that statements to fellow prisoners, *like confessions to family members or friends*, bear sufficient indicia of reliability to be placed before a jury

without confrontation of the declarant." (Emphasis added.) *Id.*, 527 U.S. at 147, 119 S.Ct. at 1905, 144 L.Ed.2d at 141 (Rehnquist, C.J., concurring in judgment). Accordingly, we hold that the admission of Bonnie's and Joshua's testimony concerning Miles's confession did not violate the Confrontation Clause.

{¶ 46} For the foregoing reasons, we overrule appellant's second proposition of law.

Grand Jury Issues

{¶ 47} In his fifth proposition of law, appellant argues that he was indicted "by an improperly constituted grand jury and upon inadequately presented evidence" in violation of his constitutional rights. Appellant failed to raise these issues in the trial court, and therefore he has waived them. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. See, *e.g.*, *State v. Joseph* (1995), 73 Ohio St.3d 450, 455, 653 N.E.2d 285, 291; *State v. Taylor* (1997), 78 Ohio St.3d 15, 23, 676 N.E.2d 82, 91.

{¶ 48} Appellant's argument that he was indicted by an improperly constituted grand jury would fail even if it were properly before this court. Appellant claims that Hamilton County uses only voter registration lists to select grand jurors and that when appellant was tried "the percentages of African-Americans and other minorities registered to vote in Hamilton County was less than the percentage of racial minorities composing the voting age population of Hamilton County." The record does not support these assertions. Moreover, "not every grand jury has to represent a 'fair cross-section,' so long as the selection process is nondiscriminatory." *State v. Williams* (1997), 79 Ohio St.3d 1, 17, 679 N.E.2d 646, 660. In *State v. Moore* (1998), 81 Ohio St.3d 22, 28, 689 N.E.2d 1, 9, we held that "[t]he use of voter registration rolls as exclusive sources for [petit] jury selection is constitutional" and does not systematically or intentionally exclude any racial group of the community. We see no reason to apply a different principle to the selection of grand jurors.

**{¶ 49}** Likewise, appellant's argument that he was indicted upon inadequate evidence would fail even if it had been properly preserved. It is not clear from the record what evidence was presented before the grand jury. Hence, whether the indictment was based on inadequate evidence cannot be evaluated. In addition, " 'an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence * * *.' " *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 929, quoting *United States v. Calandra* (1974), 414 U.S. 338, 344-345, 94 S.Ct. 613, 618-619, 38 L.Ed.2d 561, 569.

**{¶ 50}** For the foregoing reasons, appellant's fifth proposition of law is not well taken.

**{¶ 51}** In his eighth proposition of law, appellant argues that the "process used in Hamilton County to select foremen of grand juries that return capital indictments is biased geographically, racially, culturally, and socio-economically." Appellant failed to raise this issue below and thereby waived it. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Moreover, the record contains no evidence of how grand jury foremen were selected in Hamilton County, and appellant has failed to cite statistical or other evidence to suggest that the method was biased. Accordingly, appellant's eighth proposition of law is overruled.

## Trial Publicity

**{¶ 52}** In his sixth proposition of law, appellant argues that prejudicial publicity, "which occurred throughout appellant Issa's trial, deprived him of his right to a fair trial and a fair and reliable sentencing determination." However, appellant waived this issue by failing to request a change of venue. *State v. Campbell* (2000), 90 Ohio St.3d 320, 336, 738 N.E.2d 1178, 1197.

**{¶ 53}** In addition, we have reviewed the entire record in this case, and there is nothing before us that supports appellant's claim that he was denied a fair and

impartial trial because of the alleged publicity. This court has long held that voir dire examination provides the best test as to whether adverse publicity necessitates a change of venue. *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 170-171.

{¶ 54} During voir dire, only one juror recalled learning specific details of the case from pretrial publicity, and he indicated that he could put that information out of his mind and not let it influence his judgment in this case. Moreover, the trial judge repeatedly advised prospective jurors during voir dire and seated jurors throughout both phases of appellant's trial to avoid exposure to information about the case outside of the courtroom and to advise the court of any incidents of exposure. *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710, 722-723. No incidents were reported.

{¶ 55} For the foregoing reasons, appellant's sixth proposition of law is not well taken.

Indigency

{¶ 56} In his ninth proposition of law, appellant argues that he was unable to adequately defend himself because a lack of funds prevented him from hiring a crime-scene investigator, a general investigator, and a forensic pathologist. Appellant alleges that he was denied a fair trial because these experts were not provided to him at state expense.

{¶ 57} The court granted various defense requests for funds throughout the trial. For example, the court granted appellant's motions for a mitigation specialist, travel and housing expenses for appellant's family members from Jordan to testify in the penalty phase, a translator, transcripts of Linda Khriss's trial, and additional attorney fees. However, appellant did not move for funds for the experts that he now argues were necessary for a fair trial. The court need not consider an error when the complaining party did not call the matter to the trial court's attention.

*Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ **58**} Moreover, in *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus, we held that due process "requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." The circumstances surrounding this case do not support appellant's assertion that the lack of these experts resulted in an unfair trial.

{¶ **59**} The cause of Maher's death was clear, and the crime scene evidence did not suggest justifiable homicide. In addition, the fact that Miles was the actual killer was not in question. Moreover, the record reveals a thorough, professional, and well-documented autopsy and police investigation. For these reasons, appellant would have been unable to make the particularized showing required by *Mason*. Thus, if appellant had filed a motion for funds for these experts the trial court would have been justified in denying it.

{¶ **60**} For the foregoing reasons, appellant's ninth proposition of law is overruled.

## Denial of Bond

{¶ **61**} In his eleventh proposition of law, appellant argues that the trial court failed to set a reasonable bail. We disagree.

{¶ **62**} Section 9, Article I of the Ohio Constitution provides:

"All persons shall be bailable by sufficient sureties, except for a person who is charged with a capital offense where the proof is evident or the presumption great * * *."

{¶ **63**} The trial court set appellant's bail at $1,000,000. In essence, appellant argues that this was excessive and, in effect, rendered him not bailable.

Appellant complains that the trial court erred in failing to hold an evidentiary hearing to determine whether the proof was evident or the presumption great before setting bail. However, appellant did not request such a hearing and thereby waived this issue. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

**{¶ 64}** Furthermore, if the court had held a hearing on the matter, it is unlikely that a lower bail would have been set. The jury convicted appellant of Maher's murder largely on the basis of evidence available by December 5, 1997. Therefore, when appellant was arraigned on December 18, 1997, the proof was evident and the presumption great.

**{¶ 65}** For the foregoing reasons, appellant's eleventh proposition of law is not well taken.

Gruesome Photographs

**{¶ 66}** In his twelfth proposition of law, appellant alleges that the "trial court erred in admitting into evidence gruesome and cumulative photographs of the victim." We have consistently held that "photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. The trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court. *Id*. at 265, 15 OBR at 401, 473 N.E.2d at 791.

**{¶ 67}** We have reviewed the nine photographs of the murder victims that the state introduced into evidence. All were taken at the crime scene and show the victims lying on their backs in the Save-Way parking lot. Medical personnel had

cut the clothing on the victims' upper bodies and the victims' bare chests are visible in the photos. Six of the photographs, exhibits 3, 4, 5, 6, 30, and 31, each show both victims from several feet away. Although blood is visible on the brothers' chests and clothing, these photographs are not gruesome. Moreover, these photographs illustrate witness testimony describing the crime scene. Exhibit 29 is a duplicate of exhibit 5, and, therefore, the trial court erred in admitting it. However, we find that the repetition of this single photograph did not prejudice appellant, and, therefore, the error was harmless.

{¶ 68} The remaining two photographs, exhibits 7 and 8, are close views of Maher's body. Exhibit 7 shows the wound to Maher's left hand described in the coroner's testimony. This wound is not visible in any other photograph. Exhibit 8 shows the fatal wound to Maher's chest. This photograph is illustrative of the coroner's testimony and assists the finder of fact in evaluating the defense theory that the location of Maher's fatal wound shows that the shooter was not intent on killing him.[5]

{¶ 69} The photographs are not cumulative, and, with the exception of exhibit 29, discussed previously, the photographs are not repetitive. We further find that the probative value of the photographs outweighed any danger of material prejudice to appellant. *Maurer*, paragraph seven of the syllabus.

{¶ 70} Appellant also contends that "the prosecutor's closing argument, combined with the gruesome photographs, rendered Mr. Issa's trial unfair."

---

5. During closing arguments of the guilt phase of his trial, appellant's attorney stated:

"I want to take a look at the pictures. I want you to take a good look and pass it around of the body of Maher Khriss as it was found at the scene. Take a look where the bullet hole is in that body. Remember the testimony Dr. Schulz that this is the only bullet hole, this is the only bullet that struck Maher Khriss. The one you see is there, which went through his hand into his shoulder. You can look at that. I am not exaggerating. That bullet hole is in his shoulder.

"You tell me if his only purpose was to kill Maher Khriss, and the only way you're going to get paid, would you rely on that to get the job done?

"Take a look at that shot. Would you rely on one bullet hole in the shoulder to kill a person? Look at that shot. I would never have guessed that that would be the fatal shot, looking at the picture."

Appellant fails to specify what portions of the closing arguments he is challenging. Nevertheless, the prosecutors made only a few references to the photographs of the victims in their closing argument, and those were unobjectionable.[6]

{¶ 71} For the foregoing reasons, we reject appellant's twelfth proposition of law.

Sufficiency and Weight of Evidence

{¶ 72} In his tenth proposition of law, appellant challenges the sufficiency of the evidence to support his guilt of aggravated murder and argues that the judgment is against the manifest weight of the evidence. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 73} The following evidence was presented to the jury in this case. Gammoh and Howard saw appellant with a rifle in his apartment within a two-week period preceding the murders. Howard identified the murder weapon as the rifle

---

6. During closing argument, in response to appellant's counsel's argument that the location of Maher's wound indicated that the shooter was not intent on killing him (see footnote 5), the prosecutor referred to the picture of Maher and stated:

"In regards to the bullets and the shots that were in Maher Khriss's body, well, you look at the pictures. There is a hole. It's that big (indicating). Do you think that would not kill someone? When you see the bullets, they are like torpedoes.

"Why would you think that one shot couldn't or wouldn't kill someone?"

The only other reference to the pictures of the victims made by the prosecution during closing arguments was as follows:

"I think you can believe that Andre Miles thought he did shoot them in the head when you look at one of those photos. Here is State's Exhibit Number 31. It's a little extreme; but when you look at it later, you will see that it sure looks like Ziad got shot in the eye. It really looks like he was shot in the eye—Hardly blame Miles for thinking he did shoot him in the head. That wasn't what the Coroner said. I think we'd all believe this guy got it in the head; but the coroner said, 'No, he wasn't shot in the head.' We have to accept that from all appearances that's what it looks like it is."

he saw in appellant's possession. After the murders, appellant attempted to persuade Howard not to tell anyone about seeing him with the weapon.

{¶ 74} Before the murders, Miles told Joshua that appellant hired him "to kill somebody for some money." Less than four hours before Maher and Ziad were killed, Miles went to Save-Way and met with appellant. Then, Miles waited outside the store with a rifle for Maher to return. When Maher returned, Miles shot him and his brother Ziad. Miles's identity as the shooter was not questioned, because he confessed to the crime, told the police the exact location of the murder weapon, and knew details of the crime that the killer would be expected to know, *i.e.*, the type of weapon used, the stacked milk crates near the dumpster, the location of money and a shattered beverage bottle on the ground near the bodies, and the manner and direction in which the shooter fled.

{¶ 75} The day after the murder, Miles told both Bonnie and Joshua that he had shot and killed Maher and Ziad and related details of the murders. Miles told them that appellant had hired him to kill Maher and that appellant had supplied the rifle and drove him home after the murders. He also told them that he had left the murder weapon in their back yard in a white bag. Both Bonnie and Joshua saw a white bag in their back yard, and Joshua testified that it was shaped like a gun.

{¶ 76} Bonnie and Joshua independently went to appellant after the murders and told him that they wanted the rifle removed from their yard. Appellant responded to each of them that if Miles did not remove the rifle, he would. Appellant also told Bonnie to tell Miles not to come around the store because the police were investigating and that appellant would get in touch with Miles.

{¶ 77} Three days after the murders, Hayes saw Linda hand appellant $2,000 in cash along with some other money. Although the defense argued that this money was later deposited in the store's account, the defense failed to produce evidence of such a deposit.

**{¶ 78}** Gammoh testified that appellant asked him to tell police that he was with appellant around the time of the murders. Trying to create a false alibi "strongly indicates consciousness of guilt." *State v. Campbell* (1994), 69 Ohio St.3d 38, 47, 630 N.E.2d 339, 349.

**{¶ 79}** When police searched appellant's apartment they recovered a 7.62 caliber rifle shell from a nightstand in his bedroom. This was the same caliber ammunition as that used to kill Maher and Ziad.

**{¶ 80}** We find that the foregoing evidence was sufficient to establish, beyond a reasonable doubt, that appellant was guilty of the aggravated murder of Maher and that the murder was committed for hire. R.C. 2903.01(A) and 2929.04(A)(2).

**{¶ 81}** As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 545-546. After reviewing the entire record, weighing all the evidence and all reasonable inferences drawn therefrom, and considering the credibility of the witnesses, we conclude that appellant's conviction was not against the manifest weight of the evidence. Accordingly, we overrule appellant's tenth proposition of law.

Ineffective Assistance of Counsel

**{¶ 82}** In his third proposition of law, appellant argues that his counsel provided ineffective assistance. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 83} Appellant alleges that his trial counsel were deficient in three separate instances. First, appellant argues that his trial counsel should have raised the issue of appellant's "cultural competency" to stand trial. Contrary to appellant's assertion, the fact that he is a foreign national and that English is not his first language does not suggest that he lacked competency to be tried. Appellant's unsworn statement demonstrated that he understood and could speak English well. In addition, because he immigrated to the United States in 1990, our customs and culture were not mysterious to him. Furthermore, appellant was clearly intelligent, having completed two years of college in Jordan before emigrating to the United States. For these reasons, appellant was clearly capable of understanding the nature and objective of the proceedings against him and assisting in his own defense. Thus, he was competent to stand trial. R.C. 2945.37(G). Counsel is certainly not deficient for failing to raise a meritless issue. *State v. Taylor* (1997), 78 Ohio St.3d 15, 31, 676 N.E.2d 82, 97.

{¶ 84} Second, appellant argues that his trial counsel were deficient because they failed to request funds to hire investigators and a firearms expert to assist the defense. We reject appellant's argument for the reasons set forth previously in the section entitled "Indigency." That is, such a motion would have been properly denied by the trial court because appellant would have been unable to make "a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus.

{¶ 85} Third, appellant contends that his trial counsel should have filed a motion to suppress the evidence of the 7.62 caliber bullet discovered during a search of his apartment. Appellant gives no reason to suspect that the search warrant that authorized this search could have been legitimately challenged. Here, because trial counsel did not file a motion to suppress, the record is silent as to the

basis for the search warrant. However, when police executed the search of appellant's apartment on December 5, they had probable cause to do so. By that time, police had talked to Bonnie and Joshua regarding Miles's confession implicating appellant, arrested Miles and obtained his confession, and recovered the murder weapon and ammunition clip.

**{¶ 86}** Furthermore, the outcome of appellant's trial would have been the same even if the bullet found in appellant's apartment had not been introduced as evidence, as more compelling evidence linked appellant to the murder weapon, for example, Howard's testimony that he saw appellant with the murder weapon shortly before the murders and Bonnie's and Joshua's testimony that Miles told them that appellant supplied him with the rifle.

**{¶ 87}** For the foregoing reasons, we overrule appellant's third proposition of law.

### Settled Issues

**{¶ 88}** In his fourth proposition of law, appellant challenges the constitutionality of the provision of the Ohio Constitution that requires a direct appeal of capital cases from the trial court to this court. We reject this argument on the authority of *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

**{¶ 89}** In his thirteenth proposition of law, appellant argues that requiring that mitigating factors be proven by a preponderance of the evidence violates the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. We summarily reject this argument on the authority of *Delo v. Lashley* (1993), 507 U.S. 272, 275-276, 113 S.Ct. 1222, 1224, 122 L.Ed.2d 620, 626; *Walton v. Arizona* (1990), 497 U.S. 639, 650, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511, 526 (plurality); *State v. Jenkins* (1984), 15 Ohio St.3d 164, 171, 15 OBR 311, 317, 473 N.E.2d 264, 275. Moreover, appellant failed to object to this procedure at trial and thereby waived the issue. *State v. Combs* (1991), 62 Ohio St.3d 278, 291, 581 N.E.2d 1071,

1082; *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus.

{¶ 90} In his fourteenth proposition of law, appellant argues that Ohio's statutory definition of reasonable doubt is unconstitutional when applied to the penalty phase of a capital case. We reject this argument on the authority of *State v. Goff* (1998), 82 Ohio St.3d 123, 131-132, 694 N.E.2d 916, 923-924.

{¶ 91} In his fifteenth proposition of law, appellant raises constitutional challenges to Ohio's death penalty statutes. Each of appellant's arguments has been rejected in previous decisions issued by this court, and we summarily overrule them here. *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345, 357-358; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009, 1023; *State v. Jenkins,* 15 Ohio St.3d at 168-177, 15 OBR at 314-322, 473 N.E.2d at 272-279; *State v. Seiber* (1990), 56 Ohio St.3d 4, 16, 564 N.E.2d 408, 421; *State v. Weind* (1977), 50 Ohio St.2d 224, 227-229, 4 O.O.3d 413, 415-416, 364 N.E.2d 224, 228-229, vacated in part and remanded (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156; *State v. Bradley* (1989), 42 Ohio St.3d 136, 147, 538 N.E.2d 373, 384; *State v. Buell* (1986), 22 Ohio St.3d 124, 138-139, 22 OBR 203, 215-216, 489 N.E.2d 795, 807-809; *State v. Stallings* (2000), 89 Ohio St.3d 280, 297-298, 731 N.E.2d 159, 177; *State v. Raglin* (1998), 83 Ohio St.3d 253, 261 and 276-277, 699 N.E.2d 482, 490 and 500-501; *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraph two of the syllabus; *State v. Chinn* (1999), 85 Ohio St.3d 548, 567-568, 709 N.E.2d 1166, 1183; *State v. Bays* (1999), 87 Ohio St.3d 15, 32, 716 N.E.2d 1126, 1143-1144; *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

{¶ 92} Appellant also contends that Ohio's death penalty statute violates the American Declaration of the Rights and Duties of Man, which appellant claims binds the United States via the Charter of the Organization of American States. We reject this argument on the authority of *State v. Phillips* (1995), 74 Ohio St.3d 72,

103-104, 656 N.E.2d 643, 671. Moreover, appellant failed to raise this claim at trial and thereby waived it. See *State v. Keene* (1998), 81 Ohio St.3d 646, 669, 693 N.E.2d 246, 265.

Independent Sentence Evaluation

{¶ 93} In accordance with R.C. 2929.05(A), we now independently determine whether the aggravating circumstance outweighs the mitigating factors in this case and whether appellant's sentence is excessive or disproportionate to sentences in similar cases. R.C. 2929.05(A). We begin by considering whether the aggravating circumstance charged against appellant, R.C. 2929.04(A)(2), murder for hire, was proven beyond a reasonable doubt. We find that it was.

{¶ 94} Against this aggravating circumstance, we weigh the nature and circumstances of the offense, the history, character, and background of the offender, and any applicable mitigating factors enumerated in R.C. 2929.04(B)(1) through (7). The nature and circumstances of the offense offer no mitigating value. Appellant offered Miles money to kill Maher. Appellant supplied the murder weapon and provided Miles with transportation immediately after the murder.

{¶ 95} Appellant's mother, Sara Abdel Satchsaad, and one of his brothers, Jamal Issa, provided mitigation testimony. Jamal testified that appellant has four brothers and two sisters and that the family members are Jordanian citizens. When appellant was born, the family lived in Kuwait. In 1977, appellant moved with his mother and siblings back to Jordan, but his father stayed in Kuwait to work and visited the family in Jordan for one month each year.

{¶ 96} With his father's financial assistance, appellant studied engineering in college from 1988 through 1990 in Jordan. In 1990, appellant immigrated to the United States to continue his studies. However, appellant's father died, and for financial reasons appellant was unable to continue his education. He then had to work to support himself and to help support his family in Jordan. Jamal described his brother as a "quiet person. Gentle. Loving to people." He could not believe

that his brother committed the offense charged. Jamal does not want his brother to be executed.

**{¶ 97}** Sara testified that appellant was born in 1969. She corroborated the family history given by Jamal. She testified that appellant sent money to his family from time to time before he was arrested. Prior to the murders, Sara traveled from Jordan to the United States to visit appellant. She was surprised to hear of the charges against her son because he "was of good character and quiet" and was not the sort of man to do such things. She suffers because of her son's situation and does not want him to be executed.

**{¶ 98}** In an unsworn statement, appellant reiterated his family history and noted that he came to the United States in 1990 to continue his college studies. Because of his father's death, he went to work while living in New York and Chicago. In 1992, he moved to Cincinnati and got married, but the marriage did not work out. He worked at two other stores before he started working for Maher. Maher gave him the job at his store when appellant was having difficulty finding a job. Appellant said that he liked both Maher and Ziad and that he had a good relationship with them and their families. Appellant stated that Maher and Ziad were like brothers to him and that Ziad and he had been roommates. Appellant also stated that Maher frequently permitted him to use his car, and appellant thought Maher was a "very, very, very nice person." Appellant said that he felt sorry for Maher and Ziad's family for what happened but that he had "nothing to do with" the murders and he was shocked when he heard about it.

**{¶ 99}** Appellant's "history, character, and background" provide some mitigating weight. As a child and young man, appellant lacked his father's guidance after they moved to Jordan, as his father could visit the family for only one month out of each year. Appellant attended two years of college in Jordan and then moved to the United States to continue his studies, but his father's death

prevented him from pursuing his education and he undertook employment to support himself and to help his family financially.

{¶ 100} In addition, the record suggests that appellant remained steadily employed while in the United States. This is entitled to some mitigating weight. See *State v. Fox* (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124, 133.

{¶ 101} Appellant's mother and brother both described appellant as being of good character. They love him and do not want him executed. This also provides some mitigating weight. *State v. Mason*, 82 Ohio St.3d at 170, 694 N.E.2d at 957.

{¶ 102} Appellant also offered the fact that he was not the principal offender in the offense as a mitigating factor to consider. R.C. 2929.04(B)(6) provides one of the enumerated mitigating factors to consider and weigh against the aggravating circumstance: "If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim."

{¶ 103} After reviewing the facts of this case, we give no weight to this mitigating factor. Although appellant was not the actual killer, *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746, he was nevertheless a crucial participant in Maher's murder. Appellant offered to pay Miles to kill Maher. He then supplied the weapon and assisted in Miles's escape after the murder. But for appellant's involvement, Miles would not have killed Maher.

{¶ 104} No evidence suggests that the remaining statutory mitigating factors are applicable here: R.C. 2929.04(B)(1) (inducement by the victim), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of criminal record), or (B)(7) (other factors).

{¶ 105} Overall, we find, beyond a reasonable doubt, that the aggravating circumstance outweighs the mitigating factors. We must now determine whether appellant's sentence is excessive or disproportionate to sentences in similar cases.

{¶ 106} Appellant argues, in his seventh proposition of law, that his death sentence is excessive and disproportionate to penalties in similar cases. In support of this assertion appellant points to the disparity between the outcome of his trial and the outcomes of Linda's and Miles's trials. Appellant states that Linda was acquitted of the charges against her in relation to this crime and Miles received life imprisonment without the possibility of parole.

{¶ 107} We have held, however, that "[d]isparity of sentence does not justify reversal when the sentence is neither illegal nor an abuse of discretion." *State v. Jamison* (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 188. Moreover, "[t]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, syllabus. Neither Linda nor Miles received a death sentence, and their trial records are not before this court; thus we refuse to include a review of those cases in our analysis. *State v. Smith* (1997), 80 Ohio St.3d 89, 118, 684 N.E.2d 668, 694; *State v. Green* (1993), 66 Ohio St.3d 141, 151, 609 N.E.2d 1253, 1262.

{¶ 108} We find that the penalty imposed in this case is neither excessive nor disproportionate when compared with other capital cases in which an aggravated murder was committed for hire. See, *e.g.*, *State v. Williams* (1988), 38 Ohio St.3d 346, 528 N.E.2d 910; *State v. Getsy* (1998), 84 Ohio St.3d 180, 702 N.E.2d 866.

{¶ 109} For the foregoing reasons, we affirm appellant's conviction and death sentence.

*Judgment affirmed.*

MOYER, C.J., RESNICK and F.E. SWEENEY, JJ., concur.

COOK, J., concurs separately.

PFEIFER, J., concurs in part and dissents in part.

LUNDBERG STRATTON, J., dissents.

---

**Cook, J., concurring.**

{¶ 110} Like the majority, I find no plain error in admitting the appellant's postarrest statements, notwithstanding the provisions of Article 36 of the Vienna Convention on Consular Relations. I arrive at this conclusion, however, by applying the plain-error analytic framework described in *United States v. Olano* (1993), 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508. Applying an *Olano* analysis, I would find that the error Issa complains of in his first proposition of law was not "plain," and therefore cannot constitute reversible error. See *State v. Hill* (2001), 92 Ohio St.3d 191, 205, 749 N.E.2d 274, 286-287 (Cook, J., concurring in judgment); *State v. McKee* (2001), 91 Ohio St.3d 292, 300-301, 744 N.E.2d 737, 744 (Cook, J., dissenting). At present, the question whether Article 36(1)(b) of the Vienna Convention creates individual rights that are enforceable in American courts remains open. See *Breard v. Greene* (1998), 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529, 538 (*per curiam*) (noting, without deciding, that the Vienna Convention "arguably" confers individual right to consular assistance following arrest); see, also, *United States v. Page* (C.A.6, 2000), 232 F.3d 536, 540. I concur in the majority opinion in all other respects.

{¶ 111} I also write separately to respond to the view, advocated by Justice Lundberg Stratton, that the failure to inform Issa of any rights he had to consular access under Article 36 of the Vienna Convention constitutes "structural error" warranting automatic reversal. Although Justice Lundberg Stratton voices the legitimate position that the states must follow international treaties made under authority of the United States, there is simply no legal basis upon which to conclude that the "structural error" doctrine should apply here.

{¶ 112} Treaties of the United States are on the "same footing" with federal statutes under the United States Constitution. *Whitney v. Robertson* (1888), 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386, 388. Thus, violation of a treaty is

treated just like a violation of a federal statute. We do not necessarily treat a violation of either, however, as a violation of one's constitutional rights. As the United States Court of Appeals for the Fourth Circuit observed:

"Although states may have an obligation under the Supremacy Clause [Article VI, United States Constitution] to comply with the provisions of the Vienna Convention, the Supremacy Clause does not convert violations of treaty provisions (regardless whether those provisions can be said to create individual rights) into violations of *constitutional* rights. Just as a state does not violate a constitutional right merely by violating a federal statute, it does not violate a constitutional right merely by violating a treaty." (Emphasis *sic*.) *Murphy v. Netherland* (C.A.4, 1997), 116 F.3d 97, 100.

{¶ 113} Accordingly, because the failure to advise an accused of his or her rights under Article 36 of the Vienna Convention does not rise to the level of a constitutional error, suppression of an accused's postarrest statements is *not* an appropriate remedy for a violation. *United States v. Page*, 232 F.3d at 540-541; *United States v. Li* (C.A.1, 2000), 206 F.3d 56, 61; *United States v. Lombera-Camorlinga* (C.A.9, 2000), 206 F.3d 882, 885-886 (en banc). We ordinarily do not suppress evidence as a remedy for a statutory violation absent a violation of an underlying constitutional right. *State v. Droste* (1998), 83 Ohio St.3d 36, 40, 697 N.E.2d 620, 623; see, also, *United States v. Thompson* (C.A.11, 1991), 936 F.2d 1249, 1251.

{¶ 114} Justice Lundberg Stratton does not contend that suppression is the appropriate remedy for violation of any rights Issa may have had under Article 36 of the Vienna Convention. Rather, she argues that "the failure to inform the defendant of his rights under the Vienna Convention constitutes structural error" warranting reversal. But this conclusion cannot possibly be correct under the existing doctrine of structural error. "Structural" errors are a category of fundamental *constitutional* errors that "are so intrinsically harmful as to require

automatic reversal * * * without regard to their effect on the outcome." *Neder v. United States* (1999), 527 U.S. 1, 7, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35, 46.[7] Thus, a "structural error" necessarily involves the deprivation of a constitutional right. See *Brecht v. Abrahamson* (1993), 507 U.S. 619, 629-630, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353, 367 (describing structural errors as a category of constitutional error defying harmless-error analysis); *Arizona v. Fulminante* (1991), 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331 (describing structural errors as "constitutional deprivations * * * affecting the framework within which the trial proceeds, rather than simply an error in the trial process"); *Sullivan v. Louisiana* (1993), 508 U.S. 275, 282, 113 S.Ct. 2078, 2083, 124 L.Ed.2d 182, 191 (Rehnquist, C.J., concurring) (noting that *Fulminante* "divided the class of constitutional violations that may occur during the course of a criminal proceeding" into "trial error[s]," which are amenable to harmless-error analysis and "structural defects," which are not). Without some error affecting a criminal defendant's *constitutional* rights, however, the structural-error doctrine is simply not implicated. And because a violation of the Vienna Convention is not a constitutional error, see *Murphy*, 116 F.3d at 100, it therefore cannot be deemed "structural error." Accord *Garcia v. State* (Nev.2001), 17 P.3d 994, 997.

{¶ 115} Moreover, it is worth noting that the United States Supreme Court has already undermined the notion that a violation of Article 36 of the Vienna Convention can be deemed structural error. In *Breard v. Greene*, the Supreme Court addressed Article 36 of the Vienna Convention in the context of a federal habeas corpus action. The defendant in *Breard*, a citizen of Paraguay who was convicted of capital murder in a Virginia court, filed a motion for habeas relief in

---

7. The United States Supreme Court has recognized only a very limited category of errors as "structural." These include the complete denial of counsel, a biased trial judge, racial discrimination in jury selection, denial of the right to self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction. *Neder v. United States*, 527 U.S. at 8, 119 S.Ct. at 1833, 144 L.Ed.2d at 46 (collecting cases).

which he argued, for the first time, that arresting authorities never informed him of his right to contact the Paraguayan Consulate. *Breard*, 523 U.S. at 373, 118 S.Ct. at 1354, 140 L.Ed.2d at 536. The Supreme Court held that Breard had procedurally defaulted his Vienna Convention claim by failing to raise it in state court. *Id.*, 523 U.S. at 375, 118 S.Ct. at 1354, 140 L.Ed.2d at 537. The court rejected as "plainly incorrect" the claim that the Vienna Convention was "the 'supreme law of the land' and thus trump[ed] the procedural default doctrine." *Id.* Significantly, the court also noted that, even if Breard had properly raised his Vienna Convention claim in state court, "it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction *without some showing that the violation had an effect on the trial*." (Emphasis added.) *Id.*, 523 U.S. at 377, 118 S.Ct. at 1355, 140 L.Ed.2d at 538, citing *Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302. By noting that Breard would be unlikely to demonstrate prejudice, the Supreme Court implicitly rejected the notion that a proven violation of Article 36 of the Vienna Convention amounts to structural error; by definition, a structural error obviates any requirement of demonstrating prejudice. See *Neder*, 527 U.S. at 7, 119 S.Ct. at 1833, 144 L.Ed.2d at 45-46; see, also, *Lambright v. Stewart* (C.A.9, 1999), 191 F.3d 1181, 1191-1192 (structural error does not require showing of prejudice, even on federal habeas corpus review).

{¶ 116} For these reasons, I see no constitutional barrier to this court utilizing a plain-error analysis in disposing of Issa's arguments concerning Article 36 of the Vienna Convention.

———————————

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 117} As I stated in dissent in *State v. Murphy* (2001), 91 Ohio St.3d 516, 562, 747 N.E.2d 765, 813, restricting the universe of cases this court reviews when conducting proportionality review "continually lower[s] the bar of proportionality." This case then will enable prosecutors to go where they have never been before.

For in this case, after conducting proportionality review, a majority of this court has upheld a sentence of death even though the defendant was not the principal offender, even though the principal offender did not receive the death penalty, even though the defendant was not present when the murder took place, and even though the murder victim's wife, who allegedly initiated the murder by paying the defendant to get a gun, was acquitted.

{¶ 118} None of this is to suggest that Issa is not culpable for the murder. He is, and I vote to affirm his convictions. He was an active participant in the planning of the murder and the murder almost certainly would not have occurred without him. However, the facts remain: Issa did not kill; Issa was not present during the killing; the actual killer did not receive the death penalty. If ever a sentence of death deserved to be vacated because of proportionality, this is it. But of course, we cannot consider the case in which Issa's accomplice received a life sentence because he received a life sentence, and we cannot consider the case in which the victim's wife was acquitted because she was acquitted.

{¶ 119} Never mind that the facts are exactly the same; never mind that Issa was not the trigger man, he was eligible to be charged with capital murder, he was convicted of capital murder, and he was sentenced to death. All the rest, according to the majority, is irrelevant. I beg to differ.

{¶ 120} R.C. 2929.021 requires clerks of courts to file with this court certain basic information concerning each case in which a capital indictment is filed. R.C. 2929.03(F) requires trial courts to file a separate opinion here when they impose a life sentence under R.C. 2929.03(D). This information would be helpful to this court but it is seriously incomplete. We should also receive information on every case in which a capital indictment could have been sought. We also should be informed of the ultimate resolution of each potential or actual capital case. Without this information, our ability to conduct serious and thorough proportionality review is significantly compromised.

{¶ 121} Issa's death sentence should be reversed because it is disproportionate to those received by his accomplices. He should be sentenced to life in prison. I dissent.

_____

**LUNDBERG STRATTON, J., dissenting.**

{¶ 122} I respectfully dissent from the majority's decision to affirm the defendant's convictions and sentence of death. The defendant was not properly advised of his consular rights under the Vienna Convention, Article 36, and, therefore, I would reverse the judgment of the trial court and remand for a new trial.

{¶ 123} The Vienna Convention on Consular Relations was created in 1963, and today, more than one hundred sixty countries have ratified the treaty. See State Department, Pub. No. 10518, Consular Notification and Access, January 1998: Instructions for Federal, State, and Other Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them (1998) at 42. The United States signed the Vienna Convention on April 24, 1963, and it became effective with respect to the United States on December 24, 1969. 21 U.S.T. 77.

{¶ 124} Article 36 sets forth the framework for communication between foreign nationals and their consuls and imposes obligations on United States law enforcement:

"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

"* * *

"(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to any consular post by the person arrested, in prison, custody or detention shall also

be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.*" (Emphasis added.)

"Consular access serves two functions. It serves the needs of foreign nationals who benefit from prompt communication with consular officials, as well as their intervention during legal proceedings; at a minimum, it provides a cultural bridge for detained nationals who must otherwise navigate through an unfamiliar and often hostile legal system. It also enables governments to monitor the safety and fair treatment of their nationals abroad, to reassure relatives and friends at home, to promote respect for human rights, and to avoid disruptions in foreign relations that could result from the mistreatment of detained persons." Aceves, International Decisions: *Murphy v. Netherland* (1997), 116 F.3d 97 (1998), 92 Am.J.Internatl.L. 87, 89-90.

{¶ 125} In October 1973, the United States Department of State concluded, "In the Department's view, Article 36 of the Vienna Convention contains obligations of the highest order and should not be dealt with lightly." Quoted in Aceves, The Vienna Convention on Consular Relations: A Study of Rights, Wrongs, and Remedies (1998), 31 Vand.J.Transnatl.L. 257, 270. Although the United States vigorously insists on consular notification for its own nationals, we often fail to comply with the treaty regarding foreign nationals in our country. Of the eighty-three foreign nationals currently on death row in the United States, the vast majority were not alerted to their right to consular notification under the Vienna Convention. Henry, Overcoming Federalism in Internationalized Death Penalty Cases (2000), 35 Tex.Internatl.L.J. 459, 459-460, citing The International Bannister Foundation, Reported Nationals on Death Row in the United States, at a now inaccessible web address; see related address *<http://www.ibf.brum.net/fornat1.htm>*. Moreover, attempts to raise this issue have not been successful. At least two thirds of foreign nationals executed since

reinstatement of the death penalty in 1976 unsuccessfully raised the treaty issue. *Id.* at 460.

{¶ 126} Today, the majority follows the trend by failing to recognize the significance of defendant's rights under the Vienna Convention. The majority concludes that because defense counsel failed to raise defendant's Vienna Convention claim in the trial court, he has waived all but plain error, and the majority goes on to find no plain error on these facts.

{¶ 127} In my view, however, the failure to inform the defendant of his rights under the Vienna Convention constitutes structural error, affecting " 'the entire conduct of the trial from beginning to end" as well as the "framework within which the trial proceeds.' " *State v. Esparza* (1996), 74 Ohio St.3d 660, 661, 660 N.E.2d 1194, 1196, quoting *Arizona v. Fulminante* (1991), 499 U.S. 279, 309-310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331. I agree with the majority that suppression is not the remedy, however. Because the right to be advised of consulate access rights affects every aspect of a trial, I believe that the treaty's provisions can be enforced only by starting anew. Therefore, I believe that a new trial is the appropriate remedy.

{¶ 128} On June 27, 2001, the International Court of Justice agreed. The court, which is the principal judicial organ of the United Nations, delivered its judgment in the *LaGrand* case, holding that the United States, in arresting, detaining, trying, convicting, and sentencing Karl and Walter LaGrand, violated its international legal obligations to Germany, in its own right and in its right of diplomatic protection of its nationals, as provided by Articles 5 and 36 of the Vienna Convention. See *Germany v. United States of Am.* (2001), *http://www.icj-cij.org/icjwww/idocket/igus/igusframe.htm*. (To view the *LaGrand* case, ftp://ftp.sconet.state.oh.us\Opinions\2001\982449.pdf.) The LaGrand brothers, born in Germany in 1962 and 1963 respectively, were arrested in 1982 in Arizona and convicted of first degree murder, attempted first degree murder, attempted

armed robbery, and two counts of kidnapping. Both brothers were sentenced to death in 1984 for their crimes.

{¶ 129} The German consulate was made aware of the case only in June 1992 by the LaGrands themselves, who had learned of their rights from other resources, and not from the Arizona authorities. On December 21, 1998, the LaGrands were formally notified by the United States authorities of their right to consular access. After the brothers' execution dates were set for 1999, Germany intervened in an attempt to prevent the execution of the LaGrands. Although Germany sought on several levels to prevent the execution of the LaGrands, both were executed in 1999.

{¶ 130} The International Court of Justice noted that the United States conceded that United States authorities failed to advise the LaGrand brothers of their consular rights under the Vienna Convention on Consular Relations. The court held in a fourteen-to-one decision that "by not informing Karl and Walter LaGrand without delay following their arrest of their rights under Article 36, paragraph 1(*b*), of the Convention, and by thereby depriving the Federal Republic of Germany of the possibility, in a timely fashion, to render the assistance provided for by the Convention to the individuals concerned, the United States of America breached its obligations to the Federal Republic of Germany and to the LaGrand brothers under Article 36, paragraph 1." *Id.* at paragraph 128(3).

{¶ 131} Moreover, the court held that "by not permitting the review and reconsideration, in the light of the rights set forth in the Convention, of the convictions and sentences of the LaGrand brothers after the violations referred to in paragraph (3) above had been established, the United States of America breached its obligation to the Federal Republic of Germany and to the LaGrand brothers under Article 36, paragraph 2, of the Convention." *Id.* at paragraph 128(4). Further, the court held that "by failing to take all measures at its disposal to ensure that Walter LaGrand was not executed pending the final decision of the

International Court of Justice in the case, the United States of America breached the obligation incumbent upon it under the Order indicating provisional measures issued by the Court on 3 March 1999." *Id.* at paragraph 128(5). Last, the court held that "should nationals of the Federal Republic of Germany nonetheless be sentenced to severe penalties, without their rights under Article 36, paragraph 1 (*b*), of the Convention having been respected, the United States of America, by means of its own choosing, shall allow the review and reconsideration of the conviction and sentence by taking account of the violation of the rights set forth in that Convention." *Id.* at paragraph 128(7).

{¶ 132} The *LaGrand* decision makes clear that the United States must not take lightly the provisions of the Vienna Convention on Consular Relations. Today the majority does that which the International Court of Justice and even our Constitution warn against.

{¶ 133} The Supremacy Clause, Section 2, Article VI of the United States Constitution provides: "This Constitution, and the Laws of the United States * * * *and all Treaties made*, or which shall be made, * * * *shall be the supreme Law of the Land; and the Judges in every State shall be bound* * * *."* (Emphasis added.)

{¶ 134} This very court has held in the past that the protections of treaties are on par with the Constitution. In *State v. Vanderpool* (1883), 39 Ohio St. 273, this court reviewed the provisions of the Ashburton Treaty, which provided for extradition, and held, "The provisions of this treaty are part of the law of the land, enforceable by the judicial tribunals of this state, in behalf of a person so detained and prosecuted." *Id.*, paragraph two of the syllabus. The court continued, "This treaty is therefore the law of the land, and the judges of every state are as much bound thereby as they are by the constitution and laws of the Federal or State governments. It is therefore the imperative duty of the judicial tribunals of Ohio to take cognizance of the rights of persons arising under a treaty to the same extent as if they arose under a statute of the state itself." *Id.* at 276-277.

**{¶ 135}** Thus, in addition to the Supremacy Clause, this court in *Vanderpool* clearly held that treaties are on par with the Constitution, and we are bound by both. Therefore, I would find that the failure to advise the defendant of his rights under the Vienna Convention is akin to the failure to advise a defendant of his Sixth Amendment right to counsel. See *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

**{¶ 136}** The majority finds that, as in the case of a statutory violation, the exclusionary rule is not an appropriate sanction, absent an underlying constitutional violation, unless the treaty expressly provides for that remedy. I agree with the majority that exclusion is not the remedy, but I would distinguish *Kettering v. Hollen* (1980), 64 Ohio St.2d 232, 18 O.O.3d 435, 416 N.E.2d 598, in that it deals with a statutory violation, not a treaty violation. As noted above, I would find that the failure to advise defendant of his rights under the Vienna Convention equates to the failure to advise him of his Sixth Amendment right to effective assistance of counsel. See *Vanderpool*. Therefore, as noted above, I would reverse and remand to the trial court for a new trial.

**{¶ 137}** The Vienna Convention offers foreign nationals, who often have both cultural and language barriers, the opportunity to obtain information from their consul about the legal system in which they are detained and how it may differ from the legal system in the defendant's home country. Particularly with foreign nationals with language barriers, cultural differences, and scarce resources, the Vienna Convention can greatly enhance their ability to defend themselves; likewise, our nationals in foreign countries equally need such assistance.

**{¶ 138}** Having grown up abroad and having lived in three different foreign countries, I have seen first-hand the vastly different foreign legal systems and how our nationals are often treated in a foreign land. Article 36 of the Vienna Convention may provide our nationals their only safeguard against a hostile legal system.

{¶ 139} The Vienna Convention offers Americans abroad the comfort of reciprocity. Under starkly different legal systems, where rights we take for granted, such as the right to counsel, a jury, discovery, cross-examination, and open trials, are routinely not afforded by other countries, how could our nationals possibly prove that they did not waive their consulate rights? With the closed trials and secrecy of many legal systems, how could our nationals overcome foreign legal barriers to prove that the failure to provide access to a consul resulted in an error at trial? Our best way to ensure that other nations honor the treaty by providing consular access to our nationals is to demand strict adherence to the right to consular access for foreigners in *our* country. In that way, our nationals will be provided an advocate to try to safeguard the minimal protections we take for granted in the United States.

{¶ 140} When we excuse our failure to advise the defendant of his consulate rights on the ground that there was "no plain error," we provide the very words and tools to other countries to use to excuse their denial of rights to our nationals, and the protections of the treaty become meaningless. "If the right under the treaty * * * can only be enforced by the surrendering nation by protest or otherwise against the one making the demand, that is, if it is a question not cognizable in the courts, it is of little value under our system of Federal and state governments." *Vanderpool*, 39 Ohio St. at 277.

{¶ 141} If the United States fails in its responsibilities under the convention, then other member countries may choose to do unto us as we have done unto them. Oliver Wendell Holmes said, "Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." *The Western Maid* (1922), 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299, 303. If we are to expect that our nationals will be afforded the rights guaranteed them under the treaty, we must guard the rights of foreign nationals in our country as well. I

respectfully dissent and would reverse the judgment of the trial court and remand the cause for a new trial.

_____

### APPENDIX

{¶ 142} Proposition of Law No. I.  A treaty signed by the United States government is the law of the land.  Therefore, under the Vienna Convention, Issa's rights were violated by the police's and court's failure to inform him of his right to meet with Jordan counsel.

{¶ 143} Proposition of Law No. II.  The trial court allowing in hearsay statements of Andre Miles as to Issa's alleged role in the murders violated Issa's right to confront witnesses, as mandated by the United States and Ohio Constitutions.

{¶ 144} Proposition of Law No. III.  A defendant is denied effective assistance of counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I, of the Ohio Constitution, when defense counsel fails to raise the issue of defendant's cultural competency to stand trial, fails to have an independent firearms expert, investigation or crime scene experts.

{¶ 145} Proposition of Law No. IV.  A change in the Ohio Constitution, which provides less review to capital appellants (whose crimes were committed on or after January 1, 1995) violates the Fourteenth Amendment and fails to provide the meaningful appellate review mandated by the Eighth Amendment.

{¶ 146} Proposition of Law No. V.  Appellant's indictment was returned by an improperly constituted grand jury and upon inadequately presented evidence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 147} Proposition of Law No. VI.  The prejudicial publicity, which occurred throughout appellant Issa's trial, deprived him of his right to a fair trial

and a fair and reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 148} Proposition of Law No. VII. Appellant's death sentence is excessive and disproportionate to sentences in similar cases, thereby depriving Mr. Issa of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as Sections 9 and 16, Article I of the Ohio Constitution.

{¶ 149} Proposition of Law No. VIII. The process used to select the foremen of grand juries which return capital indictments in Hamilton County is biased. As a result, appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated.

{¶ 150} Proposition of Law No. IX. The defendant-appellant was prejudiced by a lack of funds to adequately defend himself in this litigation. As a result, Issa was deprived of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 151} Proposition of Law No. X. The judgment of conviction on the aggravated murder counts [*sic*] is unsupported by legally sufficient evidence and is contrary to the manifest weight of the evidence, and as a result, appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated.

{¶ 152} Proposition of Law No. XI. Appellant was denied reasonable bond in violation of his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 9, of the Ohio Constitution.

{¶ 153} Proposition of Law No. XII. The admission of gruesome and otherwise prejudicial photographs which were cumulative of each other as well as other evidence violated appellant Issa's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

{¶ 154} Proposition of Law No. XIII. Requiring that mitigating factors be proven by a preponderance of the evidence violates the Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

{¶ 155} Proposition of Law No. XIV. The trial court's application of Ohio's statutory definition of reasonable doubt in the mitigation phase of appellant's capital trial deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 156} Proposition of Law No. XV. Ohio's death penalty law is unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Ahmad Fawzi Issa.

————————————

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for appellee.

*Faulkner & Tepe* and *A. Norman Aubin; Herbert E. Freeman*, for appellant.

*Speedy Rice*, urging reversal for *amicus curiae*, National Association of Criminal Defense Lawyers.

————————————