OPINION
{¶ 1} Appellant James Efford appeals a judgment of the Stark County Common Pleas Court convicting him of one count of illegal manufacture of drugs (R.C. 2925.04), two counts of trafficking in drugs (R.C. 2925.03(A)(2)), and two counts of possession of drugs (R.C. 2925.11(A)):
 ASSIGNMENTS OF ERROR {¶ 2} I. APPELLANT WAS DENIED THE RIGHT TO REPRESENT HIMSELF OR TO HAVE COUNSEL OF HIS OWN CHOOSING.
 {¶ 3} II. APPELLANT WAS DENIED THE RIGHT TO REPRESENTATION WHEN HE WAS PLACED INCOMMUNICATO WITH HIS APPOINTED COUNSEL THROUGHOUT THE TRIAL.
 {¶ 4} III. APPELLANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN HE WAS PLACED IN A SEPARATE STRUCTURE THROUGHOUT THE TRIAL.
 {¶ 5} IV. THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
On June 24, 2001, Alliance Police officers were dispatched to Northview Avenue to respond to a fight in progress, and to a report of a suspicious motor vehicle in the area. When the officers arrived, they noticed a male leaving the scene, and two women sitting on the curb. The officers attempted to make contact with the male, who responded by fleeing the scene. A silver Ford Taurus was parked at the end of the street, and appeared to be abandoned. The women, who were the victims in the fight, described the fleeing suspect as a black male with gold teeth, with the first name of Richard. Police found a puppy at the scene. The collar on the puppy included the name "Wolfie,", an address of "841 East Cambridge," and the words, "Don't fuck with me."
{¶ 6} In an effort to locate Richard, some of the officers went to the Duke bar, an establishment in Alliance known to the officers for drug activity. The person the women referred to as Richard was known to frequent this bar, but the police could not located him there. They then proceeded a half a block to 841 East Cambridge, the address on the puppy's collar.
{¶ 7} Upon reaching the residence on East Cambridge, officers observed a Geo Prism parked in front, without any license plates. Based on the VIN number, officers checked BMV records, and determined the proper license plate for the car was the plate on the Ford Taurus they had viewed earlier. The officers received no answer upon knocking on the front door. After repeated attempts to get someone to answer the door, officers were notified that the suspect had fled from the rear of the residence.
{¶ 8} Officers converged on the scene in an attempt to locate the suspect. He was described as wearing black pants and a white tee shirt, with a red and white bandana. Officers were able to eventually locate appellant hiding in some bushes by a house in the neighborhood. They ordered appellant out of the bushes, placed him on the ground, and handcuffed him. He was notified of his constitutional rights and searched. Officers found nine individually wrapped rocks of crack cocaine in appellant's pants pockets. They also retrieved a driver's license for appellant with the name "Richard D. Reynolds, Jr." Appellant also possessed a birth certificate bearing the name Richard Gregory Reynolds, and told the officers that his name was Richard Reynolds.
{¶ 9} Appellant was transported to the Alliance Police station for processing. On the way through the garage, they walked past the puppy that was taken from the scene of the fight. Appellant responded that the dog belonged to him. They later determined that appellant had used several aliases, including Richard Reynolds, T'Shaun Yarber, and James Efford.
{¶ 10} Police obtained a search warrant for the residence on 841 East Cambridge. The warrant was executed later that day. The officers found in plain view a significant amount of crack-cocaine in the bedroom and kitchen. The officers also found drug paraphernalia connected to the making or cooking of crack-cocaine. A pill container with one pill of Ecstacy was found in the home. Finally, paper work for a pager was found in the bedroom, which used the name T'Shaun Yarber. Social Security information revealed a photo of T'Shaun Yarber, which was a photo of appellant.
{¶ 11} Appellant was indicted by the Stark County Grand Jury with one count of illegal manufacture of drugs, two counts of trafficking in drugs, two counts of possession of drugs, one count of tampering with evidence, and one count of possession of criminal tools. The case proceeded to jury trial in the Stark County Common Pleas Court.
{¶ 12} During pre-trial proceedings, including a suppression hearing, appellant related to the court that he did not want his privately retained attorney to continue to represent him. The court repeatedly informed appellant that he could fire his attorney and hire new counsel, but that he had to do so before trial. Appellant failed to retain new counsel, but renewed his intention on the day of trial to fire Mr. Pitinii, his retained counsel. Appellant requested that the court appoint an attorney for him. The court inquired as to the reason for appellant's dissatisfaction with his retained counsel. Appellant responded that counsel was encouraging him to plead guilty to avoid additional prison time upon conviction after trial. The court informed appellant that he had had sufficient time to obtain new counsel, and had not done so, and the trial was going forward.
{¶ 13} Prior to trial, the court became concerned about the potential for appellant to conduct himself inappropriately before the jury. After repeated discussions concerning appellant's inability to conduct himself as a gentlemen in the courtroom, the court decided prior to trial that appellant was to be placed in a glass sound-proof box in the courtroom. This box was approximately ten feet from defense counsel, and allowed appellant to hear the proceedings.
{¶ 14} At the end of the State's case in chief, the trial court granted appellant's motion for a judgment of acquittal on the charges of tampering with evidence and possession of criminal tools. The remainder of the charges were submitted to the jury, and appellant was convicted of the five drug offenses. Appellant was sentenced to a four-year term of incarceration for illegal manufacturing of drugs, a four-year term of incarceration on one of the trafficking charges, and a one year imprisonment term on each of the remaining charges. All but one of the one-year sentences for trafficking were imposed consecutively, resulting in an aggregate term of ten years incarceration.
 I
{¶ 15} Appellant argues that he was denied his right to represent himself or have counsel of his own choosing. He argues that the court erred in failing to address him concerning his right to represent himself at trial or otherwise remedy the situation regarding the problems with his retained counsel.
{¶ 16} On the final day of the suppression hearing, which was conducted one day before trial, the following dialogue occurred between appellant and the trial court concerning his desire to have Attorney Pitinii withdraw as counsel:
 {¶ 17} [Appellant]: * * * My girlfriend had initially called Mr. Pitinii and tried to talk to him about the case. He told her that he tried cases like this before. He told her that wouldn't be a problem. He told her that he was very experienced at this kind of case. Maybe like two or three weeks ago, last week actually like he tried a case.
 {¶ 18} Then he tell me he was going to try to file for the motion to suppress. He said he was confident that the motion to suppress would go through. He told me that it would work because they had no basis to search the house. I told him where I stayed at. He never brung none of this up in the case. Then maybe three weeks ago he tell me everything was going cool.
 {¶ 19} Then he told me that we shouldn't go to trial because it was going to be an all white jury, he told me I would lose, told me that an all white jury I mean all be against me. Told me they won't like me. He told me to take seven years. I told him I didn't want to take seven.
 {¶ 20} He comes back every week. He's trying to get me to take seven years. Again I asked him to withdraw from my case over five times. He do not. He says if lose, I get ten years or better. That's it.
{¶ 21} THE COURT: Okay. Thank you.
{¶ 22} MR. PITINII: May I respond?. Do need to?
 {¶ 23} THE COURT: No. He has made his statement, and Mr. Pitinii, if you'll call your first witness. You may proceed.
{¶ 24} MR. PITINII: Officer Slimak.
{¶ 25} [APPELLANT]: I do not want him.
{¶ 26} THE COURT: Just a second.
 {¶ 27} [APPELLANT]: I do not want to be represented by Mr. Pitinii. I will not be represented by Mr. Pitinii. I do not want to be represented by Mr. Pitinii.
{¶ 28} THE COURT: Hold on one second.
(Thereupon, a discussion was held off the record.)
 {¶ 29} THE COURT: For the record, Mr. Efford, your choice is if you want a new lawyer you are free to hire a new lawyer. You have chosen not to do that. And to continue to say to the Court well, I'm not happy with this lawyer, that lawyer, I am watching Mr. Pitinii. I see what he's doing. And so far he's filed the appropriate papers. * * *
 {¶ 30} So Mr. Pitinii is experienced. He's well qualified. He has done a number of felony trials before. Number of drug cases, number of different things. He knows what he's doing. I think sometimes you hear what you want to and hear not what he is saying to you.
 {¶ 31} You are charged with a number of felony drug offenses.
 {¶ 32} [APPELLANT]: He told already me I was going to lose.
 {¶ 33} THE COURT: They are serious. And whether or not you are going to be found guilty or not is up to a jury. But I told you a long time ago, Mr. Efford, if you are so concerned about your own personal well-being, then go hire your own lawyer.
 {¶ 34} Apparently you have made a decision that you don't want to do that. And I'm not going to continue to have lawyers service until you find one you like. He is your attorney of record. This trial begins tomorrow and, Mr. Pitinii, if you'll question your witness we will move.
{¶ 35} [APPELLANT]: I want to leave then.
 {¶ 36} THE COURT: He's sitting right where he is. Just either secure him right there or —
{¶ 37} [APPELLANT]: Secure me? I want to leave then.
 {¶ 38} THE COURT: Go ahead, Mr. Pitinii, because you got to stay and go through it. Okay, Mr. Pitinii. Go ahead.
{¶ 39} He's going to stay right there.
{¶ 40} [APPELLANT]: Why should I let him represent me?
 {¶ 41} THE COURT: Tomorrow let's see if we can be in Judge Haas' courtroom. Go ahead, Mr. Pitinii.
Tr. Supp. III at 4-8.
{¶ 42} Appellant relies on State v. Gibson (1976),45 Ohio St.2d 366, for the proposition that after he expressed displeasure with his retained counsel, the court was required to inquire further, and advise him of his right to represent himself. We disagree. The Sixth Amendment, made applicable to the States through the Fourteenth Amendment, guarantees that a defendant in a criminal trial has an independent right of self representation, and that he may proceed to defend himself without counsel when he voluntarily, knowingly, and intelligently elects to do so. Id., citing Faretta v. California
(1975), 422 U.S. 806. However, in Gibson, the Ohio Supreme Court addressed the issue of the adequacy of the court's dialogue with a defendant who stated that he wished to discharge his retained counsel, and stated that he would go into court without counsel. In the instant case, appellant never expressed a desire to represent himself. Rather, he wanted to discharge Mr. Pitinii the day before trial. The court responded that he was entitled to discharge his counsel and obtain new counsel, as the court had advised appellant throughout the pre-trial proceedings when he continually expressed his dissatisfaction with Mr. Pitinni. Because appellant never made a request to represent himself, the protections concerning inquiry into the voluntariness of the decision, as guaranteed under Faretta and its progeny, were never triggered.
{¶ 43} The court did not err in having the trial go forward with retained counsel continuing to represent appellant. The first assignment of error is overruled.
 II
{¶ 44} Appellant argues that he was denied the right to effective assistance of counsel when he was placed in an isolation booth in the courtroom during trial. He claims that his placement in the booth denied him the ability to communicate with counsel, thereby hindering his defense.
{¶ 45} It is not clear from the record that he was entirely placed out of contact with his counsel throughout the trial. The record reveals that he was placed in a sound proof glass box, but does not reveal what contact, if any, took place between appellant and counsel during the trial. The record does not reflect that counsel was hindered in any way in his representation of appellant by appellant's placement in the box and an inability to communicate at counsel table.
{¶ 46} Furthermore, appellant does not have an absolute right to be seated next to his attorney in the courtroom. Crim.R. 43 (B) provides that where a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with his presence, the trial may proceed in his absence. The rule further provides that where the court determines that it may be essential to the preservation of the constitutional rights of the defendant, the court may take such steps as are required for the communication of the courtroom proceedings to the defendant. Id.
{¶ 47} As will be discussed in III, below, the potential for appellant's disruptive conduct in the presence of the jury caused the court to place him in the sound proof box. The record does not reflect that his presence in this box had an effect on counsel's ability to present a defense.
{¶ 48} The second assignment of error is overruled.
 III
{¶ 49} Appellant argues that he was denied a fair trial by his placement in the isolation booth during trial.
{¶ 50} Prior to voir dire and outside the hearing of the prospective jurors, the trial court had the following colloquy with the appellant on the morning of trial:
 {¶ 51} THE COURT: * * * we are on the record now and the jury is not in the courtroom yet. The jury has not been chosen. And Mr. Efford is in the courtroom.
 {¶ 52} Mr. Efford, you are going to have a couple of choices here today and they are all your choices. You can sit as you're sitting now and act like a gentleman and cooperate with your attorney or not cooperate. That's your decision. But you will be permitted to sit here as an adult and listen to the trial and be part of it.
 {¶ 53} Your second option is if you act out or you attempt to disrupt the trial, then I have two choices. One, I can put a belt on you which would cause electric current to go —
{¶ 54} [APPELLANT]: I asked for that.
 {¶ 55} THE COURT: Or you can be put in the booth over here.
{¶ 56} [APPELLANT]: Give me the belt.
 {¶ 57} THE COURT: Well, if I give you in the belt I'm going to put you in the booth first, then I'm going to put the belt on you because I don't think it's appropriate for them to put a belt around a human being. So your call, Mr. Efford.
{¶ 58} [APPELLANT]: Give me the belt.
 {¶ 59} THE COURT: Do you want to sit in the booth, or do you want to be a gentleman out here I will put you in the booth with a belt. It's not going to be one or the other. What do you want to do?
 {¶ 60} [APPELLANT]: Why can't the jury see me with the belt on?
 {¶ 61} THE COURT: Mr. Efford, do you want to wear the belt?
 {¶ 62} [APPELLANT]: I want the jury to see me with the belt on.
 {¶ 63} THE COURT: I know you want the jury to see you with the belt on. What do you want to do, sit here or go to the booth?
 {¶ 64} [APPELLANT]: If I go in the booth I'm still going to take the stand.
 {¶ 65} THE COURT: I would be more than happy to have you take the stand. The question I am asking you now is do you want to sit out here as an adult, or do you want to go in the booth?
{¶ 66} [APPELLANT]: Take the stand with the belt on.
 {¶ 67} THE COURT? You are not going to get the belt. You are going in the booth. Do you want to go in the booth or sit there?
{¶ 68} [APPELLANT]: I want the belt.
 {¶ 69} THE COURT: Why don't you do this * * * I'm going to ask you to respond to my question. If you do not respond to my question, then you are going to leave me no other decision but to put you in the box now because I don't want you to be sitting here and then decide to act out in front of the jury, then the deputies have to take you into that box. I'm trying to at least give you some dignity here.
{¶ 70} [APPELLANT]: I will just get up and walk in.
{¶ 71} THE COURT: Sorry?
 {¶ 72} [APPELLANT]: I will just get up and walk in the box.
 {¶ 73} THE COURT: Do you want to give it a shot trying to act like a gentleman first, or do you want to go right to the box?
{¶ 74} [APPELLANT]: You left me no choice.
 {¶ 75} THE COURT: I want to give you the choice of being a gentleman first.
{¶ 76} Tr. Trial I at 5-8 (Emphasis added).
{¶ 77} Thereafter, the trial court heard appellant's motion in limine. A discussion between counsel for the parties and the trial court occurred off the record. The trial court commenced the following discussion:
 {¶ 78} THE COURT: Mr. Pitinii asked Mr. Efford if he was cuffed. Mr. Efford, I think your response was no, but I soon will be.
 {¶ 79} [APPELLANT]: No. Mr. Pitinii told you what my answer was.
{¶ 80} THE COURT: And it was no, but I soon will be?
{¶ 81} [APPELLANT]: I just said no.
{¶ 82} [PROSECUTOR]: I heard what you heard, Your Honor.
 {¶ 83} THE COURT: Answer was no, but you would be. Put him in the box. The Court finds that Mr. Efford has been not responsive in his answers and has made statements that I feel that to allow him to sit out here poses a danger to court personnel.
 {¶ 84} And also I think if he starts to act out in front of the jury it would just further prejudice his case. So I will have him put into the box.
 {¶ 85} MR. PITINII: For the record, this box is approximately 10 feet away from us. He is encased in a glass box which he can hear all the proceedings, but apparently you cannot hear him back. And so he's not sitting at the defense counsel table with me. Thank you.
{¶ 86} Tr. Trial I at 14-15.
{¶ 87} The trial court gave the jury a cautionary instruction regarding appellant's placement in the box, telling the jurors they were not to infer guilt by appellant's placement in the soundproof box. Tr. Trial 1, 18-20.
{¶ 88} While placement in the isolation booth is arguably less restrictive and less potentially prejudicial than shackling a defendant during trial, we believe the cases concerning shackling provide instruction to the court concerning the proper standard for considering the instant claim. A criminal defendant is generally entitled to appear in court without shackles, as the presumption of innocence may be undermined when the defendant is presented in restraints. See, e.g.Zygadlo v. Wayright (C.A.11, 1983), 720 F.2d 221, cert. denied (1984),466 U.S. 941. While shackling is an extreme measure, in some circumstances it is necessary for the safe, reasonable, and orderly progress of the trial. State v. Carter (1977), 53 Ohio App.2d 125. A prisoner may be shackled when such precaution is necessary to prevent violence or escape. State v. Woodards (1966), 6 Ohio St.2d 13, 23. The decision to restrain a defendant lies within the sound discretion of the trial court. Id.
{¶ 89} In this case, the court was faced with a defendant who continually demonstrated his reluctance to follow the court's directives concerning his behavior in the courtroom. He repeatedly gave evasive answers and refused to directly answer the court's questions about his future conduct in the courtroom. The court repeatedly implored appellant to behave like a gentlemen or be subject to restraint, yet appellant refused to commit to behaving properly. During the recess immediately prior to the entry of the prospective jurors into the courtroom, appellant was overheard by the court telling his attorney that he would soon be handcuffed. This comment implied that appellant intended to be disruptive once the jury entered the courtroom. The court considered placing an electric belt around appellant, which was an option appellant preferred, but the court rejected this option after appellant stated that he wanted the jury to see him with the belt on. The box effectively prevented appellant from disrupting the proceedings, while preserving his right to be present in the courtroom during the trial. Further, the court stated on the record that he felt appellant's statements and failure to respond to questioning created a danger to court personnel if he was allowed to sit in the open courtroom during trial. The court several times noted on the record that he believed if appellant began to act out in front of the jury, and had to be taken to the box by the deputies, the result would be more prejudicial to his case than if he were placed in the box at the beginning of the trial, and the jury was instructed immediately not to infer guilt from his presence in the box.
{¶ 90} Appellant has not demonstrated the court abused its discretion in placing him in the box. The third assignment of error is overruled.
 IV
{¶ 91} Appellant argues that the jury's verdict is against the manifest weight of the and sufficiency of the evidence. Specifically, he argues that there was no evidence linking him to the residence at 841 East Cambridge, or to the drugs and paraphernalia found at the residence.
{¶ 92} When reviewing a claim of sufficiency of the evidence, the relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Tresh (2001), 90 Ohio St.3d 460, 484, 2001-Ohio-4, cert. denied, 553 U.S. 904. When considering a claim that a judgment is against the manifest weight of the evidence, the court sits as a twelfth juror, and determines whether in reviewing in the evidence, the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient.State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52; Statev. Issa (2001), 93 Ohio St.3d 49, 67, 2001-Ohio-1290.
{¶ 93} On both claims, appellant argues that there is nothing to link him to the residence in Alliance where the evidence of drug activity was found. This claim is without merit. When police responded to the call of a fight, they received a description of a black male with gold teeth, using the name Richard. The dog found at the scene had the address of 841 East Cambridge on the tag. Appellant admitted to police later that the dog belonged to him. Further, when police arrived at the residence on East Cambridge, appellant had exited out of the back in an effort to evade them, and was apprehended in the bushes nearby. There was evidence that appellant used the aliases of Richard Reynolds and T'Shaun Yarber. Police later found paperwork in the house related to a pager, made out to T'Shaun Yarber. There was sufficient evidence to link appellant to the residence, and thus to the drugs and drug paraphernalia found therein. Further, appellant cannot demonstrate that the jury lost its way in reviewing and weighing the evidence in this case, and concluding that he was the resident at the home on East Cambridge Street where police found the drugs.
{¶ 94} The fourth assignment of error is overruled.
{¶ 95} The judgment of the Stark County Common Pleas Court is affirmed.
By GWIN, J., and BOGGINS, J., concur HOFFMAN, P.J., concurs separately.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Stark County Common Pleas Court is affirmed. Costs to appellant.