[Cite as *State v. Evans*, 2018-Ohio-212.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | Case No. 17CA3600 |
| v. | : | |
| | : | <u>DECISION AND</u> |
| DENNIS EVANS, | : | <u>JUDGMENT ENTRY</u> |
| | : | |
| Defendant-Appellant. | : | RELEASED 01/16/2018 |

APPEARANCES:

Lori J. Rankin, Chillicothe, Ohio, for Appellant.

Matthew S. Schmidt, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for Appellee.

Hoover, P. J.

{¶ 1} Defendant-appellant, Dennis Evans ("Evans"), appeals his conviction following a jury trial in the Ross County Common Pleas Court. The jury found Evans guilty of the offense of possession of a deadly weapon while under detention, a felony of the first degree in violation of R.C. 2923.131. On appeal, Evans contends that the jury's verdict was against the manifest weight of the evidence. We find that Evans's conviction was not against the manifest weight of the evidence. As a result, Evans's assignment of error is overruled. Accordingly, we affirm the judgment of the trial court.

**I. Procedural History**

{¶ 2} Evans was indicted in September 2016 by the Ross County Grand Jury for having a metal shank, a deadly weapon, in a detention facility, to wit the Chillicothe Correctional Institute ("CCI"). Evans filed a motion to dismiss in November 2016, which was later withdrawn by Evans. The trial court granted Evans's motion to withdraw the motion to dismiss in January 2017. In May[1] 2017, a jury heard the evidence and issued a verdict of guilty. The trial court sentenced Evans to a prison term of ten years to be served consecutive to the sentence that Evans is currently serving for a prior conviction.

{¶ 3} We delve into the details of the facts of the case in the analysis *infra*.

{¶ 4} Evans timely appealed.

## II. Assignment of Error

{¶ 5} Evans assigns the following error for our review:

THE TRIAL COURT ERRED IN VIOLATION OF MR. EVANS'S RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 16 OF THE OHIO CONSTITUTION IN UPHOLDING THE JURY'S VERDICTS WHEN THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. Law and Analysis

{¶ 6} In his sole assignment of error, Evans contends that the verdict was against the manifest weight of the evidence.

### A. Standard of Review

{¶ 7} "When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of witnesses." *State v. Topping,* 4th Dist. Lawrence No. 11CA6, 2012–Ohio–5617, ¶ 60. "The reviewing court must bear in mind, however, that credibility

---

[1] We note that the trial transcript is dated July 11 and July 12, 2017. However, the verdict form is dated May 3, 2017.

generally is an issue for the trier of fact to resolve." *Id.*, citing *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.  This is so because "the trier of fact * * * is in the best position to view the witnesses and to observe their demeanor, gestures and voice inflections and to use those observations to weigh credibility." *State v. Fisher,* 4th Dist. Jackson No. 11CA10, 2012–Ohio–6260, ¶ 9.

{¶ 8} "Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Quotations omitted.) *Topping* at ¶ 60.

{¶ 9} If the State presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that all of the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d 493, ¶ 16 (4th Dist.). A reviewing court should find a conviction against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id*.

### B. The Jury's Verdict Was Not Against the Manifest Weight of the Evidence

{¶ 10} At the jury trial, the State called Austin Brown ("C.O. Brown") as its first witness. In December 2015, C.O. Brown was a corrections officer at CCI. On December 2, 2015, C.O. Brown was assigned to Housing Unit F2 and was making security rounds around the restroom area. C.O. Brown testified that he saw Evans in the bathroom placing an unknown object in his left shoe. C.O. Brown stated that he saw Evans sitting on the toilet with his left shoe off his foot. After Evans looked around the area, he placed an unknown item in his left shoe. After witnessing

this, C.O. Brown called his partner, corrections officer Jason V. Newland ("C.O. Newland"), to assist in a pat-down search of Evans. Next, C.O. Brown called Evans to the C.O. station desk to do the pat-down search.

{¶ 11} C.O. Brown described Evans's behavior as "suspicious." C.O. Brown directly ordered Evans to take off his left shoe and "shake it out." Evans did shake out the shoe; but he would not release his hand from the shoe. When C.O. Brown commanded Evans to take his hand out of the shoe, Evans tried to run. C.O. Brown gave Evans a direct order to stop running; but Evans continued to run anyway. C.O. Brown was able to grab Evans's shirttail as Evans continued to resist. After moving about five feet, C.O. Brown tackled Evans. C.O. Newland activated his man down alarm which caused other yard officers and sergeants to respond. One of the corrections officers who responded to the man down alarm was corrections officer Robert McGuire ("C.O. McGuire"). C.O. McGuire helped C.O. Brown secure Evans on the ground. Evans had kept his hands under him when he went down. Then C.O. Brown handcuffed Evans. The officers stood Evans up. At this time, C.O. Brown observed a shank where Evans's upper half of his body had been lying on the floor. C.O. Brown described the shank as "a six inch steel shank sharpened at the end with a cloth handle."

{¶ 12} Next, another corrections officer, Robert Horton ("C.O. Horton"), secured the shank. The officers had also locked the dorm down and kept everybody away from the area. As for Evans, C.O. McGuire placed him on the wall and kept control of him. At this time, other officers were still responding to the man down alarm by running into the room. The sergeants and the lieutenant came in, took pictures of the shank, and escorted Evans out of the unit.

{¶ 13} The State's second witness was C.O. Newland. C.O. Newland testified that he was the officer working on the second floor on December 2, 2015. C.O. Newland corroborated C.O.

Brown's testimony that he had been called by C.O. Brown to come down and help him search an inmate due to suspicions that the inmate had something in his shoe. After C.O. Newland arrived at the C.O. station desk, C.O. Brown instructed Evans to take his shoes off. C.O. Brown was focusing on Evans's left shoe. C.O. Newland testified that once Evans started to take off his shoes, Evans ran. C.O. Brown grabbed him by the shirt; and they fell to the floor. C.O. Newland then activated his man down alarm.

{¶ 14} Next, C.O. Newland testified that he had instructed Evans to stop; and he was behind them and within three feet of where C.O. Brown had secured Evans. C.O. Newland then cleared the other inmates from the area. C.O. Newland was still behind C.O. Brown when other responding officers responded to the man down alarm. C.O. Newland testified that he was trying to keep an eye on Evans's shoes. He also testified that the other officers blocked his vision while Evans was being lifted from the floor. Thus, C.O. Newland testified that he did not see Evans take anything out of his shoe and that he did not see anything on the ground. C.O. Newland stated that he could not see Evans or his location.

{¶ 15} The State's third witness was C.O. McGuire. C.O. McGuire was working at CCI on December 2, 2015. C.O. McGuire testified that he was one of the officers that responded to the man down alarm. When C.O. McGuire came in the "crash gate," he looked to his left and saw C.O. Brown on the ground with Evans. When C.O. McGuire arrived, Evans's hands were underneath him. C.O. McGuire ran to them and helped secure Evans. C.O. McGuire helped C.O. Brown restrain Evans so that they could handcuff him. They had to pull Evans's arms out from under him in order to handcuff him. They then told Evans to stand up; they lifted him and helped him to his feet. C.O. McGuire then testified that he saw a weapon on the ground directly

underneath where Evans's body had been. C.O. McGuire then escorted Evans to the west side door, then to medical to be seen for treatment.

{¶ 16} The State's fourth witness was C.O. Horton. C.O. Horton was also working at CCI as a corrections officer on December 2, 2015. C.O. Horton testified that he responded to the man down alarm. When C.O. Horton arrived at the front door of housing unit F2, Evans was being handcuffed by C.O. Brown. C.O. Brown and C.O. McGuire were then helping Evans to his feet. C.O. Horton was one to two feet away from them at this point.

{¶ 17} C.O. Horton testified that he then discovered the homemade weapon on the floor underneath where Evans had been assisted off the ground. C.O. Horton stated that "if [Evans] were to be laying on the floor belly down, it would have been located around the lower abdomen." C.O. Horton described the weapon as "an approximately six inch piece of metal sharpened to a point with what appeared to be white athletic tape around the handle." C.O. Horton also recognized the actual shank that was introduced as State's Exhibit One as the homemade weapon that he had discovered. C.O. Horton also testified regarding the surveillance video. C.O. Horton stated that he could see a reflection of something shiny in Evans's hand on the surveillance video.

{¶ 18} The State's last witness in its case in chief was Trooper Sherry Wells ("Trooper Wells"). Trooper Wells testified that she is an investigator with the Ohio State Highway Patrol. Trooper Wells was informed of the incident; observed the shank; and after she completed her investigation, she recommended that Evans be charged with possession of a deadly weapon in a detention facility. Trooper Wells had obtained a certified copy of his prior conviction for murder. Trooper Wells also explained to the jury that pick style shanks are capable of causing death. Trooper Wells had also demonstrated to the jury that the shank could fit in her shoe and that she

could walk "just fine." Trooper Wells did admit on cross-examination that she had no personal —"on the scene" knowledge— of the incident.

{¶ 19} Evans testified on his own behalf regarding the incident giving the jury a starkly different set of facts. Evans explained to the jury that he had been housed in CCI on December 2, 2015, for a murder conviction out of Franklin County, Ohio.

{¶ 20} In addition, Evans testified that he had been using marijuana in the bathroom. After he had used the bathroom, he came out of the bathroom when the officer called him to the desk to remove his shoes. Evans stated that he had a bag of marijuana in his shoe sitting on the side and that is why he ran. Evans claimed that he had nothing else in his shoe. Evans testified that when he ran, he was able to get a "little ways away from" the officer and he "was able to throw the marijuana as hard as" he could. Evans stated, "I don't recall where I threw it but I threw it far. I threw it as hard as I could."

{¶ 21} Furthermore, Evans explained that he would probably have been charged for having the marijuana, which in turn would have caused him to be moved from CCI. Evans stated that he did not want to be moved from CCI because it was a nice place to be. However, Evans admitted on cross-examination that he would not get in a lot of trouble for having a little bit of marijuana.

{¶ 22} Evans denied any knowledge of the origin of the shank. He testified that it was not in his shoe. Also, Evans stated that if he had had the shank in his shoe, I "probably would have got to it" in a different manner. Evans also explained that his hands were underneath of him in order to break his fall when he was tackled.

{¶ 23} After Evans testified in his case in chief, the State called two rebuttal witnesses. C.O. Brown was the first rebuttal witness. C.O. Brown told the jury that he did not see Evans

throw an object. Furthermore, C.O. Brown testified that they searched the area and no other objects were found, other than the shank. C.O. Horton was the State's last rebuttal witness. C.O. Horton stated that he searched the area for other contraband; and nothing was discovered.

{¶ 24} R.C. 2923.131(B) states that: No person under detention at a detention facility shall possess a deadly weapon.

{¶ 25} Evans only contests that he possessed the shank. Evans does not contest that he was housed in a detention facility. Even if he would argue this point, the testimony from all witnesses demonstrates that at the time of the offense, Evans was an inmate imprisoned in the Chillicothe Correctional Institute. Likewise, Evans does not contend that the shank is not a deadly weapon. Trooper Wells's testimony explaining that pick style shanks are capable of causing death was unrefuted. Thus, Evans's argument on appeal is that he did not possess the shank. We will focus on the possession element.

{¶ 26} The evidence before the jury included the following testimony: C.O. Brown testified that he observed a shank where Evans's upper half of his body had been lying on the floor. In addition, C.O. McGuire testified that he saw a weapon on the ground directly underneath where Evans's body had been. Next, C.O. Horton testified that he discovered the homemade weapon on the floor underneath where Evans had been assisted off the ground. C.O. Horton further stated that "if [Evans] were to be laying on the floor belly down, it would have been located around the lower abdomen."

{¶ 27} On the other hand, Evans claimed that he did not possess the shank; instead, he contends that he possessed marijuana. Evans argued that he threw the marijuana; however, no marijuana was found in the vicinity.

{¶ 28} When reviewing the evidence, we cannot find that the fact-finders, the jury, when resolving the conflicts in evidence, clearly lost its way and created a manifest miscarriage of justice. The jury was able to actually observe the demeanor, gestures, and voice inflections of the corrections officers, the trooper, and Evans; we must defer to the jury's assessment of the credibility of the witnesses. The State did, in fact, present substantial evidence for the jury to reasonably conclude, beyond a reasonable doubt, that the essential elements of the offense had been established. In our view, this is not the exceptional case in which the evidence weighs heavily against the conviction. Therefore, we find that the jury's verdict and thus Evans's conviction was not against the manifest weight of the evidence. Consequently, we overrule his assignment of error.

### IV. Conclusion

{¶ 29} Having overruled Evans's assignment of error for the reasons stated above, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earliest of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to the expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. and McFarland, J.: Concur in Judgment and Opinion.


For the Court

By:_____
Marie Hoover, Presiding Judge


**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.