[Cite as *Akron v. Beasley*, 2024-Ohio-3089.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

CITY OF AKRON

    Appellee

v.

CORTEZ BEASLEY

    Appellant

C.A. Nos.    30745
                  30746

APPEAL FROM JUDGMENT
ENTERED IN THE
AKRON MUNICIPAL COURT
COUNTY OF SUMMIT, OHIO
CASE Nos.    22 CRB 04807
                  22 TRD 07551

DECISION AND JOURNAL ENTRY

Dated: August 14, 2024

HENSAL, Judge.

**{¶1}** Cortez Beasley appeals from his convictions in the Akron Municipal Court. This Court affirms in part and reverses in part.

I.

**{¶2}** Over the course of July 3, 2022, and the early morning hours of July 4, 2022, Mr. Beasley was present for a protest that turned riotous. The protest occurred in downtown Akron and ultimately caused significant property damage throughout the city. Responding officers from the Akron Police Department, its mobile field force, its SWAT team, the Summit County Sheriff's Office, and the Ohio State Highway Patrol, worked to control the crowd. As conditions deteriorated, responding officers repeatedly announced orders to disperse throughout the city. They also deployed smoke and tear gas when those commands were ignored. Mr. Beasley was

one of the individuals the police arrested as they worked to clear the roadways for safety vehicles. He was charged with failure to disperse in Criminal Case 22CR04807.

{¶3} Two days later, officers observed Mr. Beasley operating his car in the wrong lane of travel. Officers activated their cruiser's lights and attempted to stop him as he traveled eastbound in the westbound lane of traffic on a two-lane road. The officers followed Mr. Beasley for two blocks until accelerating, cutting off his car, and forcing him to stop. Mr. Beasley was charged with a marked lanes violation in Traffic Case 22TRD07551.

{¶4} The State tried Mr. Beasley's two charges together, along with two additional charges filed under separate case numbers. A jury found him guilty of failure to disperse. The trial court then found him guilty of a marked lanes violation. The trial court sentenced Mr. Beasley in each matter, and he appealed from both sentencing entries. This Court consolidated the two appeals for briefing, argument, and decision. Mr. Beasley raises two assignments of error for review.

II.

ASSIGNMENT OF ERROR I

DEFENDANT CORTEZ BEASLEY'S CONVICTIONS REST ON INSUFFICIENT EVIDENCE.

{¶5} In his first assignment of error, Mr. Beasley argues his convictions are based on insufficient evidence. Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function . . . is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

Failure to Disperse

**{¶6}** Revised Code Section 2917.04(A) provides:

Where five or more persons are participating in a course of disorderly conduct in violation of section 2917.11 of the Revised Code, and there are other persons in the vicinity whose presence creates the likelihood of physical harm to persons or property or of serious public inconvenience, annoyance, or alarm, a law enforcement officer or other public official may order the participants and such other persons to disperse. No person shall knowingly fail to obey such order.

A person acts knowingly when he "is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of the circumstances when [he] is aware that such circumstances probably exist." R.C. 2901.22(B). Failure to disperse is a fourth-degree misdemeanor if a person's failure to obey "creates the likelihood of physical harm to persons or is committed at the scene of a fire, accident, disaster, riot, or emergency of any kind." R.C. 2917.04(C)(3).

**{¶7}** Mr. Beasley argues his conviction for failure to disperse is based on insufficient evidence because the State failed to prove two elements of that offense. Specifically, he argues the State failed to prove he (1) knowingly disregarded an order to disperse, and (2) was engaged in disorderly conduct in a group of at least five people at the time of that order. For the following reasons, we will not address Mr. Beasley's second argument.

**{¶8}** "This Court has repeatedly held that when an appellant sets forth specific grounds in a [Criminal Rule] 29 motion, [he] forfeits all other arguments on appeal." *State v. Vanest*, 2017-Ohio-5561, ¶ 27 (9th Dist.). In moving for acquittal on his charge of failure to disperse, Mr. Beasley argued there was no evidence he heard an order to disperse such that he knew an order had been given and knowingly failed to obey it. He did not challenge any of the remaining

elements of his offense. Thus, he did not argue that the State failed to prove he was engaged in disorderly conduct in a group of at least five people. Because he asserted a specific ground in his Criminal Rule 29 motion, he forfeited additional sufficiency arguments for review. *See id. Accord State v. Sebring*, 2023-Ohio-2911, ¶ 23 (9th Dist.). Accordingly, we limit our review to the single argument he preserved.

{¶9}    Captain Michael York acted as operations chief at the incident command center the police established to monitor the protest that began on the afternoon of July 3, 2022. From his position there, he was able to watch live video feeds supplied by officers in the field, city cameras, and a helicopter. He testified that the protest remained fairly calm until about 9:30 p.m. Around that time, Captain York testified, riotous activity commenced with individuals throwing items at the police station, breaking windows, knocking over barricades, setting fires, and destroying property. Captain York estimated that the police arrested about 50 people that evening. He testified that people were only subject to arrest after the mayor had declared a state of emergency, officers had given orders to disperse for several hours, officers had used smoke and tear gas to remove people from areas, and people still were not leaving.

{¶10} Lieutenant Matthew Whitmire was on duty at the protests, acting as part of the police department's mobile field force. He testified that he witnessed property being damaged around 11:00 p.m. At that point, he and his team formed a line in front of the police station. Lieutenant Whitmire testified that he began speaking through a megaphone and advising people in the crowd to leave. He specifically advised people they would be subject to arrest and/or chemical munitions if they did not leave. As he was making announcements, a member of the crowd threw a bottle of water and struck one of his fellow officers. Lieutenant Whitmire testified that his team then began deploying smoke to force the crowd to disperse.

{¶11} Lieutenant Whitmire testified that he and his team marched south. As they marched, they made announcements in which they ordered people to disperse. Lieutenant Whitmire described at least six different locations throughout the city at which he made announcements as his team continued walking south. He also testified that other teams around the city were making similar announcements, ordering people to disperse. If he or members of his team did not have a megaphone handy, Officer Lieutenant testified, they simply kept yelling out the order to disperse. He also testified that officers in cruisers were using the PA systems on their cruisers to announce the orders to disperse.

{¶12} Sergeant Todd Sinsley was on duty at the protests, acting as part of the SWAT team. He testified that his team was activated at 11:00 p.m. At that point, he was aware announcements to disperse had already been made. He testified that he and his team members were given sheets of paper with the prescribed announcement and were instructed to continue repeating the order to disperse as they were addressing the people who remained in the area.

{¶13} Sergeant Sinsley was familiar with Mr. Beasley. He identified Mr. Beasley as an individual shown in a video. The video depicted Mr. Beasley sitting on the hood of his car in the area of the protests around 5:17 p.m. A different video showed Mr. Beasley taking burning material from one dumpster and moving the burning material to a second dumpster shortly after 11:00 p.m. Sergeant Sinsley testified that he encountered Mr. Beasley several hours later when the SWAT team reached an area of Main Street near the Spaghetti Warehouse. At that point, Sergeant Sinsley testified, his team had been tasked with arresting people who were blocking the roads and preventing the fire department from being able to respond to the fires in the city. He testified that it was impossible for the police to arrest everyone, so they focused on the people who were the most problematic, who had resisted the most, or who had already been warned multiple

times or told to leave for many hours.  Sergeant Sinsley testified that the police never stopped making the announcements, ordering people in the crowd to leave.

{¶14}  Sergeant Sinsley testified that he saw Mr. Beasley standing in the roadway with a group of people.  Although other people around him were leaving, Mr. Beasley was standing there impeding the flow of southbound traffic.  Regarding Mr. Beasley, Sergeant Sinsley testified:

> He had been told [to] leave the area -- I mean . . . realistically, if you're dropped in the middle of this in the middle of the night, there's no way you're not understanding that this is not good, we need to leave.  There's gas being deployed.  There's people yelling.  There's a Mobile Field Force in their shields and batons standing in front of you.  Something's not right here.  I should probably leave.

Sergeant Sinsley stated that Mr. Beasley and the other members of his group tried to walk away when the SWAT team moved forward to arrest them, but the team succeeded in stopping Mr. Beasley before he got to the sidewalk.  He testified that Mr. Beasley was arrested around 1:35 a.m.

{¶15}  Mr. Beasley argues the State presented insufficient evidence to show that he heard and knowingly disregarded an order to disperse.  He notes that the scene of the riot was chaotic and not every officer making announcements had a megaphone or PA system.  According to Mr. Beasley, he presented evidence that any announcements made without a megaphone "likely went unheard."  He argues that evidence of blanket dispersal orders was insufficient to prove the mens rea element of his offense.

{¶16}  Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved beyond a reasonable doubt that Mr. Beasley knowingly disregarded an order to disperse.  *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The jury heard evidence that the police announced orders to disperse throughout the city for several hours by megaphone, by PA system, and by voice.  They heard evidence that officers marched through the city, deployed smoke, released tear gas, and attempted to push crowds out.  There was

evidence that Mr. Beasley was present at the scene of the protest/riot for a significant length of time, as he was seen on videos at several points throughout the evening and was not arrested until 1:35 a.m. Sergeant Sinsley testified that, just before Mr. Beasley's arrest, he saw Mr. Beasley blocking the flow of traffic as the police continued pushing the crowd to the south and making announcements. He also specifically testified that Mr. Beasley "had been told [to] leave the area . . . ." Based on the foregoing evidence, a rational trier of fact could have concluded that Mr. Beasley was aware of the orders to disperse and knowingly disregarded those orders. *See State v. Kiss*, 1992 WL 67615, *4 (9th Dist. Apr. 1, 1992). Accordingly, we reject his argument that his conviction for failure to disperse is based on insufficient evidence. Mr. Beasley's first assignment of error is overruled to the extent it addresses that conviction.

Marked Lanes Violation

**{¶17}** Akron Municipal Code 72.02 provides, in relevant part:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:

A. A vehicle shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has ascertained that such movement can be made with safety.

B. On a roadway which is divided into three lanes and provides for two-way movement of traffic, a vehicle shall not be driven in the center lane except when overtaking and passing another vehicle where the roadway is clearly visible and such center lane is clear of traffic within a safe distance, or when preparing for a left turn, or where such center lane is at the time allocated exclusively to traffic moving in the direction the vehicle is proceeding and is posted with signs to give notice of such allocation. On a roadway of three or more lanes, a center lane can be designated as a two-way left turn lane by standard signs and street markings, and operation of vehicles in said lane shall be for the purpose of deceleration and waiting to make a safe left turn only.

The code section is substantively identical to Revised Code 4511.33. *See* R.C. 4511.33(A)(1)-(2).

In applying that statute, this Court has held that, to establish a marked lanes violation, "the State

must present evidence 'that the driver of a vehicle moving either between lanes of traffic or completely out of a lane of traffic failed to ascertain the safety of such movement prior to making the movement.'" *State v. Ross*, 2013-Ohio-1488, ¶ 11 (9th Dist.), quoting *State v. Barner,* 2004-Ohio-5950, ¶ 14.

{¶18} Officer Warren Spragg testified that he and his partner began working a double shift on the afternoon of July 6, 2022. As they were responding to a dispatch just before midnight, they spotted Mr. Beasley driving his car in the wrong direction on Tallmadge Avenue. Specifically, Officer Spragg saw Mr. Beasley driving eastbound in the westbound lane of traffic on the two-lane road. He and his partner activated their cruiser's lights to execute a traffic stop, but Mr. Beasley continued driving. Officer Spragg testified that Mr. Beasley continued to drive for two blocks until their cruiser maneuvered around him, cut him off, and caused him to stop his car in the eastbound lane. Officer Spragg stated that, at the time of the incident, there was no other eastbound traffic that would have prevented Mr. Beasley from driving in the correct lane or using it to stop when the officers signaled him to pull over. Officer Spragg testified that Mr. Beasley's act of driving in the wrong lane was unsafe for the public.

{¶19} Officer Thomas Phillips acted as Officer Spragg's partner at the time of Mr. Beasley's traffic stop. He confirmed that they saw Mr. Beasley driving his car eastbound in the westbound lane of traffic on Tallmadge Avenue and forced him to stop after he ignored their cruiser's lights for two blocks. There was no testimony that any officers saw Mr. Beasley change lanes or otherwise leave the westbound lane of traffic until Officer Spragg and Officer Phillips forced his car into the eastbound lane to execute their traffic stop.

{¶20} Mr. Beasley argues his conviction for a marked lanes violation is based on insufficient evidence because there was no evidence he operated his car outside a single lane of

travel or otherwise departed from his lane of travel in an unsafe manner. The State acknowledges that the officers on scene misidentified Mr. Beasley's offense as a marked lanes violation rather than citing him for operating his car in the wrong lane of travel. Even so, the State asks this Court to uphold Mr. Beasley's conviction based on evidence that his car crossed into the eastbound lane when Officer Spragg and Officer Phillips cut him off and forced him to stop.

{¶21} Viewing the evidence in a light most favorable to the State, we cannot conclude that the State presented sufficient evidence to sustain Mr. Beasley's conviction for a marked lanes violation. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. That offense requires proof that a driver moved his car "either between lanes of traffic or completely out of a lane of traffic" without ascertaining the safety of that movement. *Ross*, 2013-Ohio-1488, at ¶ 11 (9th Dist.), quoting *Barner*, 2004-Ohio-5950, at ¶ 14. The evidence here only showed that Mr. Beasley continuously operated his car within a single lane of traffic, albeit in the wrong direction. We cannot conclude that his actions in leaving that lane of traffic based on officers forcing him to do so gave rise to a marked lanes violation. Accordingly, his conviction for a marked lanes violation is reversed. Mr. Beasley's first assignment of error is sustained to the extent it addresses that conviction.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING VIDEO EVIDENCE OF RIOTING IN WHICH DEFENDANT BEASLEY HAD NOT PARTICIPATED AND A BOLO NOTICE PERMITTING AN INFERENCE OF EARLIER WRONGDOING.

{¶22} In his second assignment of error, Mr. Beasley argues the trial court abused its discretion when it admitted certain evidence at trial. For the following reasons, we reject his argument.

**{¶23}** "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "The trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). "[T]his Court is mindful that the exclusion of evidence under [Evidence Rule] 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place." (Cleaned up.) *State v. Zappa*, 2022-Ohio-243, ¶ 30 (9th Dist.), quoting *State v. Thompson*, 2016-Ohio-4689, ¶ 25 (9th Dist.).

**{¶24}** Mr. Beasley challenges the admission of two pieces of evidence at trial. The first is a compilation video the State played for the jury. The video depicted various aspects of the riotous activity that transpired during the evening of July 3, 2022, into the early morning hours of July 4, 2022. Mr. Beasley argues the video was inflammatory because it depicted riotous activity beyond that which he was involved, there was no dispute that a riot had occurred, and the State could have relied solely on officer testimony to describe the riotous activity.

**{¶25}** The second piece of evidence Mr. Beasley challenges is a printout of a be on the lookout ("BOLO") notice the police department issued its officers before the riot. The BOLO notice depicted Mr. Beasley, his name, his height, his address, and pictures of his car. Several officers testified that the notice allowed them to recognize Mr. Beasley at the scene of the protest/riot. No one testified as to the underlying reason a notice was issued for Mr. Beasley. Even so, he argues he was prejudiced by its admission because it created "a subtle inference" that he was someone known to police and likely to have committed other crimes or bad acts.

{¶26} We will begin by addressing the compilation video the State played. Mr. Beasley's failure to disperse charge required the State to prove that (1) he knowingly disregarded an order to disperse, (2) he participated in a course of disorderly conduct with at least five people, (3) the presence of persons in the vicinity created a likelihood of physical harm to people or property or a serious public inconvenience, annoyance, or alarm, and (4) his failure to obey created a likelihood of physical harm to persons or was committed at the scene of a fire, accident, disaster, riot, or emergency. *See* R.C. 2917.04(C)(3). The compilation video showed the size of the crowd around Akron at the time of the riots, the amount of physical damage to property being caused, the serious public inconveniences being caused, and the fires burning throughout the city as officers struggled to stop the rioting. It was, therefore, probative of several elements of Mr. Beasley's offense. It also was probative of the State's argument that, even if Mr. Beasley somehow did not hear one of many direct orders to disperse as he claimed, any reasonable person in his position would have known he or she should leave the area.

{¶27} "[T]he rules of evidence do not attempt to bar all prejudicial evidence—to do so would make reaching any result extremely difficult. Rather, only evidence that is *unfairly* prejudicial is excludable." *State v. Crotts*, 2004-Ohio-6550, ¶ 23.

> "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect."

*Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001), quoting *Weissenberger's Ohio Evidence*, § 403.3, at 85-87 (2000).

{¶28} Upon review, we cannot conclude that the trial court went so far as to abuse its discretion when it admitted the compilation video at trial. Mr. Beasley has not shown that the

State offered the video to appeal to the jury's emotions. Rather, the record reflects the video aided the State in establishing several elements of Mr. Beasley's offense, including the mens rea element that he was contesting at trial. To the extent Mr. Beasley's assignment of error concerns the admission of the compilation video, it is overruled.

{¶29} We likewise reject Mr. Beasley's argument insofar as it concerns the BOLO notice. As noted, a trial court's decision to admit evidence over an objection under Evidence Rule 403(A) is only subject to reversal if it caused a defendant to be materially prejudiced. *Issa*, 93 Ohio St.3d at 64. The BOLO notice only contained Mr. Beasley's picture, his name, his height, his address, and pictures of his car. It did not contain any information as to the basis for the notice. Nor did the State elicit any testimony from officers as to the basis for the notice. The State relied on the notice strictly as an identification tool that had allowed officers to recognize Mr. Beasley and his car. Mr. Beasley's argument that the notice created "a subtle inference" of nefarious activity on his part is tentative at best. He has not shown that the trial court acted unreasonably, unconscionably, or arbitrarily when it admitted evidence of the notice at trial. Accordingly, his second assignment of error is overruled.

III.

{¶30} Mr. Beasley's first assignment of error is sustained in part and overruled in part. His second assignment of error is overruled. The judgment of the Akron Municipal Court is affirmed in part, reversed in part, and the cause is remanded for the municipal court to enter a judgment of acquittal on Mr. Beasley's conviction for a marked lanes violation.

Judgment affirmed in part,
reversed in part,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

JENNIFER HENSAL
FOR THE COURT

STEVENSON, P. J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

KENDRA N. DAVITT and LOUIS E. GRUBE, Attorneys at Law, for Appellant.

DEBORAH S. MATZ, Director of Law, and JACQUENETTE S. CORGAN and BRIAN D. BREMER, Assistant Directors of Law, for Appellee.